1  Rene L. Valladares
   Federal Public Defender
2  Nevada State Bar No. 11479
   *Laura Barrera
3  Assistant Federal Public Defender
   Michigan State Bar No. P80957
4  411 E. Bonneville Ave., Ste. 250
   Las Vegas, Nevada 89101
5  (702) 388-6577
   Laura_Barrera@fd.org
6

7

8  *Attorney for Petitioner Terrel Durr

9

10                UNITED STATES DISTRICT COURT
11                    DISTRICT OF NEVADA

12 Terrel Durr,

13             Petitioner,              Case No. 2:22-cv-00732-JAD-NJK

14      v.                             **First Amended § 2254 Petition**
   Warden High Desert State Prison, *et al.*,
15
             Respondents.
16

17

18

19

20

21

22

23

24

25

26

27

# Table of Contents

Introduction ................................................................................................. 1

Procedural History ...................................................................................... 2

I.     Trial .................................................................................................. 2

II.    Direct Appeal................................................................................... 3

III.   Post-Conviction .............................................................................. 4

IV.    Federal Court .................................................................................. 5

Statement regarding 28 U.S.C. § 2254(d)................................................. 5

Grounds for Relief ....................................................................................... 6

Ground One: The trial court violated Durr's right to due process and right to
    confront his accusers under the Sixth and Fourteenth Amendments when
    it limited cross-examination of the alleged victim Tyler Matthews. ............... 6

Ground Two: The trial court violated Durr's right to present a defense under the
    Sixth and Fourteenth amendments when it sua sponte quashed the
    defense subpoena for Tyler Matthews after the State's case-in-chief. ............ 8

Ground Three: The trial court violated Durr's right to due process and right to
    be free from self-incrimination under the Fifth and Fourteenth
    Amendments when it allowed the State to comment on Durr's invocation
    of his right to remain silent in its closing argument. ..................................... 11

Ground Four: The State suppressed materially favorable evidence in violation of
    Durr's due process rights under the Sixth and Fourteenth Amendments. ..... 12

Ground Five: Durr's trial violated his Sixth and Fourteenth Amendment rights
    to be tried by an impartial jury. ...................................................................... 18

Ground Six: Judge Douglas Smith's bias against Durr violated his Fourteenth
    Amendment rights to due process and a fair trial.......................................... 21

        Voir Dire ................................................................................................... 22

        Trial  26

Ground Seven: Durr received ineffective assistance of trial counsel in violation
    of the Sixth and Fourteenth Amendments. ..................................................... 32

ii

A. Trial counsel was ineffective for failing to protect Durr from a tainted jury after judge Douglas Smith berated a potential juror in front of the jury pool.................................................................. 32

B. Trial counsel was ineffective for failing to seek recusal or a mistrial due to judicial bias of judge Douglas Smith. ......................... 36

Voir Dire ...................................................................... 37

Trial  41

C. Trial counsel was ineffective for failing to investigate the identity of the alleged unknown coconspirator D. ............................... 47

D. Trial counsel was ineffective for failing to investigate Tyler Matthews. .................................................................... 49

E. Trial counsel was ineffective throughout the sentencing hearing. ...... 51

F. Trial counsel was ineffective for failing to seek resentencing or reconsideration with a different judge when Judge Douglas Smith penalized Durr for maintaining his innocence at sentencing.............. 52

Ground Eight: Durr received ineffective assistance of appellate counsel in violation of the Sixth and Fourteenth Amendments. ...................... 54

A. Appellate counsel was ineffective for failing to raise the issue of judicial bias on appeal........................................................ 55

Voir Dire .................................................................. 55

Trial  59

B. Appellate counsel was ineffective for failing to raise the issue of the violation of Durr's right to an impartial jury on appeal. ...................... 65

C. Appellate counsel was ineffective for failing to request reconsideration of Durr's sentence under the Nevada Habitual Offender law when the law changed in Durr's favor while his appeal was pending. .............................................................. 70

Ground Nine: Durr's sentence of life imprisonment without the possibility of parole for his unarmed robbery conviction constitutes cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments. ......... 71

Ground Ten: Durr is entitled to relief because of the cumulative effect of the errors raised on direct appeal and in this petition. ........................... 74

iii

Prayer For Relief........................................................................................ 74

Declaration Under Penalty Of Perjury .................................................. 76

# INTRODUCTION

Tyler Matthews claimed he was a victim of a robbery on October 15, 2017, when he allegedly tried to sell a PlayStation 4 video game console on Facebook Marketplace. Neither Matthews nor the State argued that Terrell Durr directly robbed Matthews–everyone agreed that it was Durr's acquaintance, who he knew as D, that got into Matthews's car and robbed him at gunpoint. (Police later determined D was Devin Freeman, but they never arrested him, and the State never turned over any information about Freeman's identity or any related investigation.) While D was committing the robbery, Durr walked over to the car and got into a short tussle with Matthews before Matthews fled the scene. Durr maintained that he did not know of Freeman's plan to rob Matthews, and Matthews has concurred.

Matthews later called the police to report the robbery. Afterwards, Matthews decided to take matters into his own hands. He hatched a plan to trick the robber into a meeting at a gas station by pretending to be a woman interested in sexual relations and sending racy photos of his girlfriend without her permission. After setting up a meeting, Matthews bought a gun and went to the gas station. A shootout ensued, but Matthews could not identify the person shooting. Matthews then called the police to report being shot at, before giving multiple false statements to police. At trial, Matthews had to be appointed an attorney and immunized for lying to the police before testifying against Durr.

Durr was indicted on nine counts related to the robbery and the subsequent shootout. He was acquitted of all charges except robbery, without the use of a deadly weapon. The conviction was Durr's fourth, making him eligible for punishment as a large habitual offender. He was sentenced to life in prison without the possibility of parole by trial judge Douglas Smith.

**PROCEDURAL HISTORY**

### I. Trial

On November 15, 2017, Terrel Durr was charged via indictment with nine counts: one count of conspiracy to commit robbery; one count of robbery with use of a deadly weapon; three counts of assault with a deadly weapon; three counts of discharging a firearm at or into an occupied structure, vehicle, aircraft or watercraft; and one count of possession of a firearm by a prohibited person.[1] The State later dropped the charge of possession of a firearm by a prohibited person.[2] On February 12, 2018, the State indicated its intent to seek punishment as a habitual criminal for Durr due to his three prior convictions.[3]

Durr went to a jury trial on July 30, 2018. The trial lasted six days. On August 6, 2018, the jury returned a verdict acquitting Durr of all counts except robbery (without the use of a deadly weapon).[4] On October 10, 2018, Durr was sentenced.[5] At the sentencing hearing, the State argued that Durr should be sentenced as a habitual criminal to 10 years to life imprisonment in light of his criminal history.[6] Parole and probation did not recommend habitual sentencing.[7] Durr's counsel asked that he be sentenced to probation.[8] Judge Smith departed greatly from all the recommendations

---

[1] 11/15/2017 Indictment.

[2] 07/31/2023 Amended Indictment.

[3] 02/12/2018 State's Notice of Intent to Seek Punishment as a Habitual Criminal; Nev. Rev. Stat § 207.010 (2017).

[4] 08/06/2018 Verdict.

[5] Tr. 10/01/2018.

[6] Tr. 10/01/2018 at 3; 5-6.

[7] Tr. 10/01/2018 at 2.

[8] Tr. 10/01/2018 at 17.

2

and sentenced Durr to life imprisonment without the possibility of parole.[9] Judgment was entered on October 5, 2018.[10]

## II.   Direct Appeal

Durr brought a timely appeal. He raised the following claims:

1.   The court erred when it circumscribed the examination of Tyler Matthews.

    a.   The district court erred by not allowing examination of Matthews concerning his pending felony case.

    b.   The district court erred by sua sponte quashing the lawful subpoena for Tyler Matthews's examination in Durr's case-in-chief.

2.   The court erred when it denied the motion to dismiss all charges against Durr.

3.   The State committed prosecutorial misconduct when it commented on Durr's invocation of silence.

4.   The court erred when it denied Durr's jury instruction #16.

5.   The court improperly allowed expert testimony in the form of "ZETX" materials.

6.   The court failed to rule on motions made during trial for a Denno hearing and discovery.

7.   The court improperly allowed Barren pleading language.

8.   The court erred in sentencing Durr to life without the possibility of parole.

---

[9] Tr. 10/01/2018 at 19.

[10] 10/05/2018 Judgment of Conviction.

      a.    It was error for the State to argue and the court to consider acquitted conduct in its sentence.

      b.    It was error for the court to sentence Durr to life without the possibility of parole.[11]

On January 15, 2021, the Nevada Supreme Court affirmed the judgment of conviction.[12] Remittitur issued on May 14, 2021.[13]

### III.    Post-Conviction

On August 24, 2021, Durr filed a Motion to Correct Illegal Sentence.[14] Durr argued that his sentence of life without the possibility of parole was illegal because the statute was amended while his case was still pending on appeal to require seven prior convictions for the large habitual.[15] The motion was denied on November 24, 2021.[16] Durr appealed, and the denial was affirmed on June 02, 2022.[17] Remittitur issued on June 27, 2022.[18]

Durr hasn't filed a state post-conviction petition for writ of habeas corpus.

---

[11] 10/07/2019 Opening Brief.

[12] 01/15/2021 Order of Affirmance.

[13] 05/14/2021 Remittitur.

[14] 08/24/2021 Motion to Correct Illegal Sentence.

[15] 08/24/2021 Motion to Correct Illegal Sentence.

[16] 11/24/2021 Order Denying Petitioner's Motion to Correct Illegal Sentence.

[17] 06/02/2022 Order of Affirmance.

[18] 06/27/2022 Remittitur.

## IV.    Federal Court

On April 2, 2022, Durr mailed his pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.[19] This Court appointed the Federal Public Defender on October 6, 2022.[20] Durr's Amended Petition is currently due on June 29, 2023.[21]

### STATEMENT REGARDING 28 U.S.C. § 2254(D)

With respect to each ground for relief in this petition, Durr alleges any rulings from the Nevada appellate courts denying him relief on the merits are (or would be) (1) contrary to, and/or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; and/or (2) are (or would be) based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Durr also asserts for the purposes of further review that the standard of review in 28 U.S.C. § 2254(d) violates the U.S. Constitution, specifically the Suspension Clause (Article One, Section Nine, clause two); fundamental principles of separation of powers (Articles One, Two, Three); the ban on cruel and unusual punishments (Amendments Eight and Fourteen); and the guarantee of due process (Amendments Five and Fourteen). *But see Crater v. Galaza*, 491 F.3d 1119 (9th Cir. 2007) (rejecting some of these arguments).

---

[19] ECF No. 01-01 at 1.

[20] ECF No. 09.

[21] ECF No. 19.

5

GROUNDS FOR RELIEF

**Ground One: The trial court violated Durr's right to due process and right to confront his accusers under the Sixth and Fourteenth Amendments when it limited cross-examination of the alleged victim Tyler Matthews.**

**Statement of Exhaustion:** This issue was exhausted on direct appeal to the Nevada Supreme Court.

"The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him." *Davis v. Alaska*, 415 U.S. 308, 315 (1974) (internal quotations omitted). United States Supreme Court cases construing the confrontation clause have held that "a primary interest secured by it is the right of cross-examination." *Id.*, quoting *Douglas v. Alabama*, 380 U.S. 415, 418 (1965).

Prior to the start of trial, the State had to have Tyler Matthews, the alleged victim, held on a material witness warrant in order to force him to attend the trial.[22] Prosecutor Kelsey Einhorn disclosed that the only reason the State had been able to make contact with Matthews was that he was arrested for an outstanding warrant on a charge of "Battery Constituting Domestic Violence – Strangulation."[23] Defense counsel Augustus Claus indicated his intent to cross-examine Matthews about the fact that he had been arrested for a felony conviction and was currently being prosecuted by the State (and the same District Attorney's office) on that charge.[24] Trial judge Douglas Smith ruled that the battery domestic violence case was

---

[22] 7/24/2018 Ex Parte Application for Order Requiring Material Witness to Post Bail; Tr. 7/25/2018 at 2-3.

[23] 7/24/2018 Ex Parte Application for Order Requiring Material Witness to Post Bail at 3-4.

[24] Tr. 7/30/2018 at 26.

6

irrelevant, and that Claus was not allowed to question Matthews about it or even the fact of the felony arrest more generally.[25]

By barring the defense from cross-examining Matthews about the felony arrest, the court denied Durr his constitutional right to confrontation. The defense's goal in attempting to introduce the felony arrest was not to show the facts of the charge, but to show Matthews's potential motivation for testifying.[26] By suppressing the existence of the pending felony prosecution, the jury was left with an inaccurate and incomplete picture of Matthews. The pending felony case was a reason for Matthews to testify favorably to the State, even if the State did not affirmatively make him any promises regarding that case. Because the pending felony case had clear implications with regards to Matthew's credibility and motivation, Durr should have been allowed to cross-examine Matthews on this information.

It is likely that if Durr had been allowed to cross-examine Matthews about the pending felony case, the jury would have determined Matthews was not credible and acquitted Durr of the robbery charge. After all, Matthews was the State's key witness. Matthews was the victim of the robbery and was the only person who provided evidence implicating Durr in the robbery when he testified Durr told D to shoot Matthews.[27] Had the jury discredited Matthews's testimony as motivated by his pending felony charge, the State would have been left with surveillance evidence showing Durr briefly tussled with Matthews, but no evidence Durr was involved in a robbery.

Any contrary decision by a state court would be contrary to, or an unreasonable application of, clearly established federal law, and/or would involve an unreasonable

---

[25] Tr. 08/01/2018 at 31.

[26] 10/20/2019 Opening Brief at 6.

[27] Tr. 08/01/2018 at 66.

determination of the facts.  See 28 U.S.C. 2254(d)(1) and (2).  The writ should be granted and the conviction and sentence should be vacated.

**Ground Two: The trial court violated Durr's right to present a defense under the Sixth and Fourteenth amendments when it sua sponte quashed the defense subpoena for Tyler Matthews after the State's case-in-chief.**

**Statement of Exhaustion:** This claim was exhausted on direct appeal to the Nevada Supreme Court.

The Supreme Court has held that "[t]he right of an accused to have compulsory process for obtaining witnesses in his favor stands on no lesser footing than the other Sixth Amendment rights that we have previously held applicable to the States." *Washington v. Texas*, 388 U.S. 14, 18 (1967). Further, that "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense…[j]ust as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense." *Id.* at 19.

Durr was denied his right to present a defense when the trial judge quashed his subpoena for alleged victim Tyler Matthews.[28] Prior to trial, defense counsel served Matthews with a subpoena in order to call him as a witness.[29] As the complaining victim, Matthews was also being presented by the State as part of their case-in-chief.[30] Prior to the start of Matthews testimony in the State's case, where they were presenting Matthews as the first witness, the judge sua sponte quashed the defense subpoena for Matthews without justification. In quashing the subpoena, the judge said "I've been doing this for 30 years and I can't remember one time that

---

[28] Tr. 08/01/2018 at 36-39.

[29] Tr. 08/01/2018 at 36.

[30] Tr. 08/01/2018 at 36-37.

a judge allowed a subpoena for a victim – for a defense attorney."[31] The judge did not elaborate on his reason for quashing the subpoena. By releasing Matthews after his testimony for the State, the judge violated Durr's due process right to present a defense.

Although the trial court allowed Durr latitude in the cross-examination of Matthews during the State's case, that was not a substitute for being able to call Matthews as a witness in the defense case-in-chief. Because Matthews was the State's first witness, much of the State's evidence had not been introduced at the time of cross-examination, and no other witnesses had testified. As a result, defense counsel could not examine Matthews related to any of the State's evidence that had not been admitted without seeking to admit it himself, which would have been against Durr's interest. For example, Claus raised the issue that none of the phone records would be in evidence when the State called Matthews to testify.[32] Claus told the court that he did not want to introduce the phone records into evidence.[33] The judge told Claus he would allow Claus to later object to the records, but that was not a viable solution.[34] By questioning Matthews about the phone records, Claus would be exposing the jury to evidence he objected to. Such cross-examination would undermine any future objection by Claus.

In addition, prohibiting Durr from calling Matthews in his case in chief prevented him from being able to examine Matthews related to information revealed by other witnesses, including information that could have been used for impeachment if Matthews had been brought back in the defense's case-in-chief. For example, it was

---

[31] Tr. 08/01/2018 at 40.

[32] Tr. 08/01/2018 at 38.

[33] Tr. 08/01/2018 at 38.

[34] Tr. 08/01/2018 at 38.

9

revealed to the defense for the first time in trial by witness Charlene Hanks (Matthew's girlfriend at the time of the alleged crime) that Matthews went out and bought a gun the day of the shootout, and that Matthew told Hanks he wanted to kill the guy.[35] This was the first indication that Matthews planned a deadly ambush rather than simply arriving armed to a possible confrontation. This claim undermined Matthew's testimony that he did not intend to get in a shootout that day, but the defense was never able to question Matthews about this. Although Durr was acquitted of the charge relating to the shootout, questioning Matthews about the inconsistency would have further undermined his credibility to the jury. Hanks also revealed during her testimony that Matthews did not have a job, and she had never seen him work.[36] This testimony supported the defense's theory that Matthews was selling marijuana, and the underlying incident was related to a drug transaction.[37] Durr could have used Hanks's testimony to impeach Matthews on whether Matthews met Freeman to sell a PlayStation 4 or to sell drugs.

It is likely that if Durr had been able to call Matthews in his case-in-chief, Durr would not have been convicted. When the judge quashed the defense subpoena, he violated Durr's right to present a defense. Any contrary decision by a state court would be contrary to, or an unreasonable application of, clearly established federal law, and/or would involve an unreasonable determination of the facts.  See 28 U.S.C. 2254(d)(1) and (2).  The writ should be granted and the conviction and sentence should be vacated.

---

[35] Tr. 08/02/2018 at 21.

[36] Tr. 08/02/2018 at 30.

[37] Tr. 08/03/2018 at 220.

**Ground Three: The trial court violated Durr's right to due process and right to be free from self-incrimination under the Fifth and Fourteenth Amendments when it allowed the State to comment on Durr's invocation of his right to remain silent in its closing argument.**

**Statement of Exhaustion:** This claim was exhausted on direct appeal to the Nevada Supreme Court.

The Fifth Amendment of the United States Constitution guarantees a defendant's right to remain silent and be free from self-incrimination. The United States Supreme Court has held that when a person invokes their right to remain silent, "it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony." *Doyle v. Ohio*, 426 U.S. 610, 619 (1976), quoting *United States v. Hale*, 422 U.S. 171, 177 (1975). Here, Durr's rights were violated when the State used his invocation of his right to remain silent to encourage the jury to draw an inference of guilt.

The State first alluded to Durr's invocation of his right to remain silent in its closing argument: "then, in the defendant's interview, when Detective Valenzuela asked him, whose phone was used to call Tyler [Matthews]? The defendant did not answer that question. He ended his interview."[38] Defense counsel let that passing reference go, but when the State brought it up again in rebuttal Claus objected:

> PROSECUTOR THUNELL: Now, when the police ask him, whose phone was utilized to call this guy? That's what police asked the defendant. And, guess what, he shuts it down right there. Whose phone was utilized to contact this, to set up this buy, for this PS4? And, guess what, I'm not talking about

---

[38] Tr. 08/03/2018 at 191.

1

2

> this anymore. Interesting, right? Because the phone is what—that's what—
>
> MR. CLAUS: That is a step too far. Objection, Your Honor, objection. That is a step too far to comment upon the implications of Mr. Durr choosing to invoke his right to silence.[39]

After the objection, the court did not give curative instructions regarding Durr's right to remain silent. Instead, it only reminded the jury that what the attorneys say is not evidence.[40] The court should have informed the jury of the right to remain silent, and that it is not proper to draw any unfavorable inference from a defendant's invocation of that right. The correct curative instruction would have been similar to the court's instruction that a jury is not to hold it against a defendant if they choose not to testify. Because the trial court failed to give curative instructions, it is likely the jury improperly held Durr's invocation against him, as evidence of guilt, just as the prosecution asked them to. This violated Durr's right to due process and right to remain silent, and prejudiced Durr. Any contrary decision by a state court would be contrary to, or an unreasonable application of, clearly established federal law, and/or would involve an unreasonable determination of the facts.  See 28 U.S.C. 2254(d)(1) and (2).  The writ should be granted, and the conviction and sentence should be vacated.

**Ground Four: The State suppressed materially favorable evidence in violation of Durr's due process rights under the Sixth and Fourteenth Amendments.**

**Statement of Exhaustion:** This is a new claim.

Due process requires the prosecution to disclose evidence that is favorable to the defendant and "is material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). A *Brady* claim consists of three elements: (1) the government

---

[39] Tr. 08/03/2018 at 257-258.

[40] Tr. 08/03/2018 at 258.

12

suppressed evidence; (2) the evidence was favorable to the defendant, and (3) the evidence was material. *Strickler v. Greene*, 527 U.S. 263, 280 (1999). The State violated Durr's due process rights by failing to turn over material information about D, Durr's allegedly unknown accomplice. The State knew that D was Devon Freeman yet pretended throughout the proceedings that D was an unknown accomplice. The State never turned over information about Devon Freeman to Durr and his counsel.

The State and Durr agreed that the person that entered Matthews's car, stole his belongings, and pulled a gun on him was not Durr. It was an allegedly unknown acquaintance of Durr that he knew as D, and the State feigned knowing nothing about. In the indictment, the State included conspiracy and aiding and abetting theories for each charge, alleging that Durr acted with an "unknown individual."[41] However, the State did know the identity of "D," and learned this information at some point before December 28, 2017, seven months before the trial began.[42]

On January 3, 2018, the Clark County Public Defender's Office filed a motion to withdraw from representing Durr due to a conflict, accompanied by an affidavit dated December 28, 2017 from assistant public defender Kelli M. Devaney-Sauter, attesting that the office could not represent Durr because they had represented the "unknown co-conspirator" Devon Freeman.[43] In her affidavit, Ms. Devaney-Sauter indicated that detectives determined the unknown co-conspirator to be Devon Freeman through subsequent investigation.[44] Detectives had previously indicated they were investigating D's identity by searching Durr's phone.[45] It appears that detectives did learn the identity of D, that he was Devon Freeman, but failed to

---

[41] 11/15/2017 Indictment.

[42] 01/03/2018 Motion to Withdraw Due to Conflict.

[43] 01/03/2018 Motion to Withdraw Due to Conflict at 2.

[44] 01/03/2018 Motion to Withdraw Due to Conflict at 2.

[45] Ex. 1: 10/31/2017 Temporary Custody Record; Declaration of Arrest at 13.

amend the indictment to correct the fact that the alleged unknown individual was no longer unknown.

The State knew of D's identity as Devon Freeman. Detectives presumably kept prosecutors apprised of the investigation, but even if they did not, the Clark County District Attorney's office was on notice of the discovery of D's identity because it was served with the motion to withdraw[46] and a DA was present at the hearing on the motion.[47] After withdrawal was granted due to the conflict, Augustus Claus was appointed to represent Durr. Importantly, the case had been proceeding in front of Judge Douglas Herndon, but was later transferred to Judge Douglas Smith,[48] so Judge Smith may not have been aware that the State knew the identity of Devon Freeman. It appears Claus was never informed of Devon Freeman's identity or given any information related to the investigation of Freeman.

The trial proceeded with the State pretending they were unaware of D's identity. An amended indictment that maintained the "unknown individual" language was filed by the State on July 31, 2018, at least seven months after detectives had informed the Clark County Public Defender's office of Devon Freeman's identity, and that office moved to withdraw.[49]

At Durr's trial, the opening statement for the State was presented by prosecutor Thunell, the same prosecutor who appeared at the hearing on the motion to withdraw due to conflict.[50] In that statement, Thunell told the jury "[a] couple of minutes later you see a man approach. Now, this isn't the defendant, this is a friend of the defendant. The defendant calls him D. That's kind of nick—that's what he calls

---

[46] 01/03/2018 Motion due to Withdraw Due to Conflict at 5.

[47] Tr. 01/11/2018.

[48] *See* Tr. 6/19/2018; Tr. 07/19/2018.

[49] 07/31/2018 Amended Indictment.

[50] Tr. 01/03/2018; Tr. 08/01/2018 at 44.

14

him. He says he doesn't know his real name, just D."[51] He continues, "we'll call [him] D because that's what the defendant says his nickname is. D has pulled out a firearm. He hadn't seen the firearm before when they were talking about, hey, PlayStation 4, controllers, games, talking about that. D's pulled out a firearm, points at him, give me everything, that's what he say to Mr. Matthews."[52]

The State continued to pretend they were unaware of the identity of Devon Freeman throughout the trial. In their direct examination of Detective Valenzuela, the State asked questions related to D's identity, seeking to place the blame on Durr for failing to provide information about D. It appears that the prosecutor stopped short of asking the detective to commit perjury by asking if he knew the identity of D, instead giving the appearance that he did not know because Durr would not give more information:

> MR. THUNELL: And did he say that it was the other guy who had done it?
>
> DET. VALENZUELA: Yes.
>
> MR. THUNELL: And the other guy did he have a nickname he knew this person as?
>
> DET. VALENZUELA: He knew him as D.
>
> MR. THUNELL: Okay.
>
> DET. VALENZUELA: D as in David.
>
> MR. THUNELL: So he called the other guy D, not like his name is David?
>
> DET. VALENZUELA: No, just D.
>
> MR. THUNELL: Okay.

---

[51] Tr. 08/01/2018 at 44-45.

[52] Tr. 08/01/2018 at 46.

DET. VALENZUELA: Yeah.

MR. THUNELL: So he knew him as D?

DET. VALENZUELA: Correct.[53]

Then later:

MR. THUNELL: Did he ever give you more information with D as to where to locate him, a name, any kind of phone number that he could reach second parties, any other information at all?

DET. VALENZUELA: No.

MR. THUNELL: Was he pressed throughout the interview to get more information about D?

DET. VALENZEULA: Yes.

MR. THUNELL: And at no point did he give you anything else other than D, the one who picked him up who he knew from a week before?

DET. VALENZUELA: Correct.[54]

In their closing argument, the State acknowledged that they were not arguing that Durr directly committed the robbery, but rather that he was guilty under theories of aiding and abetting, or conspiracy.[55] The State knew that the evidence did not support a theory that Durr directly robbed Matthews because it was Devon Freeman who got in the car, who pulled a gun, and who took Matthews's belongings. Because Devon Freeman was the key player in the robbery, it was critical that the State turn over any information they had about his identity to Durr. The State's failure to disclose D's identity materially affected Durr's defense because Durr had

---

[53] Tr. 08/02/2018 at 198-199.

[54] Tr. 08/02/2018 at 200.

[55] Tr. 08/03/2018 at 185-193.

16

admitted that he was present at the Walgreens, and his defense was that he had no knowledge that Freeman had the intention of robbing Matthews.

Based on the State's own evidence, Durr did not know any additional information about the identity of D. The State did, and so the State should have turned over information regarding the identity of D because Freeman was critical to both the allegations and the defense. If Durr had known information about D's identity, he could have found him and interviewed him, and potentially subpoenaed him for the defense. Investigator Maribel Yanez, of the Federal Public Defender's Office was able to find Freeman during the course of investigation.[56] If Durr's trial counsel had had information about Freeman, he also would likely have been able to find him. Trial counsel also could have discovered whether there were any deals between the State and Freeman that would explain the fact that Freeman had not even been arrested for this crime despite the State knowing his identity and agreeing that Freeman was the one who directly robbed Matthews.

Information about Devon Freeman's identity, and any information related to investigation of Freeman was material to the case, and critical to Durr's defense and ability to prepare for trial. By failing to turn over this information, the State violated Durr's due process rights and prejudiced Durr. Any contrary decision by a state court would be contrary to, or an unreasonable application of, clearly established federal law, and/or would involve an unreasonable determination of the facts. See 28 U.S.C. 2254(d)(1) and (2). The writ should be granted, and the conviction and sentence should be vacated.

---

[56] Ex. 5: Declaration of Maribel Yanez Regarding Devon Freeman.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**Ground Five: Durr's trial violated his Sixth and Fourteenth Amendment rights to be tried by an impartial jury.**

**Statement of Exhaustion**: This is a new claim.

The Sixth Amendment of the United States Constitution guarantees criminal defendants the right to be tried by an impartial jury. The Supreme Court has held that "part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). "Without an adequate voir dire[,] the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Id.* at 729-30, quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion). Even in the absence of a showing of actual bias, "circumstances that create the likelihood or appearance of bias" during voir dire deprive the defendant the right to an impartial jury. *Peters v. Kiff*, 407 U.S. 493, 502 (1972).

Durr was denied his right to an impartial jury when the trial judge conducted a voir dire that fell below adequate judicial standard. *See* NCJC Canon 2, Rule 2.8(B) (stating that "a judge shall be patient, dignified, and courteous…to jurors"). During voir dire, prospective juror Irene Winter expressed feeling "nervous all day long" and reported that her body was shaking.[57] When the State asked Winter to clarify why she felt nervous, she explained that she had been the victim of a robbery, the underlying charge of the Durr case, the prior year in Las Vegas.[58] Describing how she felt traumatized still by the experience, Winter said she did not believe that she could be fair and impartial.[59]

---

[57] Tr. 07/31/2018 at 145.

[58] Tr. 07/31/2018 at 146.

[59] Tr. 07/31/2018 at 147.

In response to her confirmation that she did not feel that she could be impartial, the trial judge berated her in front of the venire.[60] Trial judge Doug Smith accused her of not "being fair" to the other jurors and proclaimed that he "had it up to here with people trying to get off [the] jury."[61] To reinforce his sentiment, the trial judge ordered Winter to complete "300 hours of community service...[and to come] back [to court] every day at 9 o'clock."[62] As he excused Winter, Judge Smith stated that he would issue a warrant for her arrest if she failed to follow his orders.[63] Winter recalls that even now, five years later, it causes her anxiety to think about this interaction with Judge Smith.[64]

Judge Smith's conduct was beyond the pale. When an impartial jury is not produced through a proper voir dire, the court has committed a structural error. *Barral v. State*, 131 Nev. 520, 523 (2015). Since a structural error affects at least one of the defendant's substantial rights, the Court must analyze the error on the basis that it is "intrinsically harmful." *Id.* (quoting *Cortinas v. State*, 124 Nev. 1013, 1024 (2008)). As an intrinsically harmful error, a criminal trial conducted without an impartial jury "require[s] automatic reversal...without regard to the effect on the outcome." *Id.*

The trial judge has a responsibility to impanel an impartial jury through an evaluation of the prospective jurors' responses to questions and demeanor. *Rosales-Lopez v. United States*, 451 U.S. 182, 188-89 (1981). Throughout this evaluation, the trial judge is required to "be patient, dignified, and courteous to...jurors." *Azucena v. State*, 135 Nev. 269, 272 (2019) (quoting NCJC Canon 2, Rule 2.8(B)). This

---

[60] Tr. 07/31/2018 at 147.

[61] Tr. 07/31/2018 at 147.

[62] Tr. 07/31/2018 at 147-48.

[63] Tr. 07/31/2018 at 148.

[64] Ex. 4: Declaration of Irene Winter.

requirement stems from the likelihood that the "judge's words and conduct…'mold[s] the opinion of the members of the jury to the extent that one or the other side of the controversy may be prejudiced.'" *Id.* (quoting *Parodi v. Washoe Med. Ctr., Inc.*, 111 Nev. 365, 367-68 (1995)). When a judge creates an "atmosphere of intimidation" and does nothing to reduce the impact of this environment during voir dire, the impartiality of the jury is unassured. *Id.* at 274. In *Azucena*, the trial judge accused a prospective juror of "try[ing] to make shit up" to get out of jury service when she expressed uncertainty about being unbiased toward the defendant because of her own exposure to the type of alleged crimes working as a nurse with children. *Id.* at 269 & 272-73. During this accusation, the judge yelled at the prospective juror and threw a book against the wall before excusing her from the jury. *Id.* at 270. The trial judge then promptly continued voir dire, producing uncertainty about the impartiality of the jury selected. *Id.* at 271.

The same was true here. After the confrontation with Ms. Winter, Judge Smith continued voir dire without explaining his conduct to the jury.[65] By failing to mitigate the atmosphere of intimidation that he had created, Judge Smith tainted the prospective juror pool by producing a chilling effect: the remaining prospective jurors feared reprisal for being forthcoming and honest, having just witnessed one such prospective juror be punished with community service and potential arrest for such candor. When prospective jurors are given cause to fear reprisals for truthful answers, their respective answers to questions of voir dire cannot be presumed to be truthful. *United States v. Rowe*, 106 F.3d 1226, 1229 (5th Cir. 1997). In *Rowe*, the trial judge punished one prospective juror with an order to "com[e] back [to court] again, and again, and again…" when she expressed concern about being impartial given the nature of the charge and her relationship to a narcotics officer. *Id.* at 1228.

---

[65] Tr. 07/31/2018 at 148.

Having berated and punished both this prospective juror and another who also expressed uncertainty about being impartial in the matter of the case such that the remainder of the venire could hear it, the trial judge produced an atmosphere in which the venire's members did not feel that they could be candidly honest in response to questions for fear of similar punishment. *Id.* at 1229-30. When a trial judge fails to reduce the impact of the atmosphere of intimidation he has produced during voir dire, the entire venire has been tainted. *Id.* at 274. Despite the judge's intention to merely reprimand the sole respective prospective juror being berated, his words and demeanor have a "chilling effect" on the entire venire. *Id.* at 271.

Judge Smith's unwarranted and public castigation of prospective juror Winter during voir dire tainted the entire jury and constitutes structural error. Durr's right to be tried by an impartial jury was violated by Judge Smith's conduct. Any contrary decision by a state court would be contrary to, or an unreasonable application of, clearly established federal law, and/or would involve an unreasonable determination of the facts.  See 28 U.S.C. 2254(d)(1) and (2).  The writ should be granted, and the conviction and sentence should be vacated.

**Ground Six: Judge Douglas Smith's bias against Durr violated his Fourteenth Amendment rights to due process and a fair trial.**

**Statement of Exhaustion**: This is a new claim.

A judge demonstrates improper bias when he performs incompatible accusatory and judicial roles. *See In re Murchison,* 349 U.S. 133, 137 (1955). A judge may not act as a prosecutor nor seek to advance the position of the prosecution. *Crater v. Galaza*, 491 F.3d 1119, 1132 (9th Cir. 2007). Furthermore, opinions formed by a judge, even on the basis of facts introduced in the course of proceedings, can constitute bias where they "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States,* 510 U.S. 540, 555, (1994). The Supreme Court has held that "a favorable or unfavorable predisposition can also

deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment." *Id.* at 551. Recusal is required in such circumstances whether or not the bias arises from an extrajudicial source or evidence in the present proceedings. *United States v. Robertson*, 121 F.3d 719 (9th Cir. 1997). Furthermore, judicial bias is a structural defect, therefore, prejudice need not be proven. *Coley v. Bagley*, 706 F.3d 741,750 (6th Cir. 2013).

Trial judge Douglas Smith demonstrated bias against Durr and the defense team throughout Durr's proceedings beginning with jury selection and continuing through the trial and sentencing. As a result, Durr was denied his right to due process and a fair trial. If Durr had been tried before an unbiased judge it's likely the outcome of the trial would have been different.

### Voir Dire

Judge Douglas Smith was hostile and rude throughout jury selection. In a bench conference about a juror that did not speak fluent English, the judge told counsel that this was the worst jury panel he ever had in 32 years.[66] He did not keep his dissatisfaction between himself and counsel.  When Judge Smith dismissed the juror in question, he made a comment in front of the rest of the jury about the juror's lack of English fluency: "How could you be here 30 years and not speak English, brother, I don't understand."[67] Later that same day, Claus moved to strike for-cause another juror who admitted to not being fluent in English and seemed to have some difficulty understanding English, but the judge refused to do so.[68]

---

[66] Tr. 07/30/2018 at 223-224.

[67] Tr. 07/30/2018 at 225.

[68] Tr. 07/30/2018 at 246-247, 250.

MR. CLAUS: Do you believe that your English – that your grasp of English is sufficient to understand everything that is said here in the courtroom?

PROSPECTIVE JUROR NO. 153: Not everything.

MR. CLAUS: Do you believe that your English is sufficient to understand all the evidence that will be offered here?

PROSPECTIVE JUROR NO. 153: Not everything.

MR. CLAUS: Okay. Based upon that, do you believe that you should serve as a juror here?

PROSPECTIVE JUROR NO. 153: As I say, yes, the judge decide.

MR. CLAUS: Okay.

THE COURT: I'm leaving him on.[69]

Despite the prospective juror admitting that he would not entirely understand the courtroom proceedings or evidence, the judge inexplicably refused to strike the juror for cause. But the issue did not end there. The following day, before voir dire continued, Claus renewed his request to strike Juror 153 due to his inability to sufficiently understand English. Claus brought up several incidents demonstrating Juror 153's difficulty with comprehension.[70] The judge responded by claiming that Claus was prejudiced against Hispanic people: "a lot of them have made—made that [mistake]. And you've not brought that objection up except for this Spanish speaker. The English ones, there was a couple of English ones that made that same mistake.

---

[69] Tr. 07/30/2018 at 250-251.

[70] Tr. 07/31/2018 at 5. Claus explained that Juror 153 initially answered no to the questions of whether he had ever served as a juror and whether he had been the victim of a crime. But later, during Claus's venire, he revealed he had been robbed by two people and had been a juror in a civil case.

And you've not bringing that up. It sounds to me like you're a little biased."[71] Claus responded by explaining why Juror 153's misunderstandings were different ("with the English speakers they clearly indicated that the reason why they miscommunicated is because they misunderstood my question").[72] Claus then shot back at the judge: "Your Honor, what we're talking about here is you've accused me of being biased against a Spanish speaker. I find that particularly hilarious when you're looking at sending Mr. Durr away for some amount of time if he's convicted of anything."[73] This exchange between the trial judge and defense counsel (started by the judge), where each said the other is biased, is completely inappropriate and demonstrated hostility by the judge towards the defense. Further, the resulting conflict further heightened the appearance of impermissible bias against the defense.

Later that day, during continued voir dire, the trial judge had more hostile interactions with the jury panel. Another juror, Prospective Juror 169, told the court he had not understood proceedings and was not fluent in English.[74] The subsequent conversation between the State and Juror 169 revealed confusion.[75] The judge let the juror go, saying "who the hell comes to the United States if they're not going to take care of business."[76] Following this exchange, the court clerk called Prospective Juror 176, Irene Winter, to fill the vacated seat.[77]

Ms. Winter informed the court that she has been extremely nervous all day sitting in the court "[m]y heart is – palpitation so hard. And it's like I cannot

---

[71] Tr. 07/31/2018 at 5.

[72] Tr. 07/31/2018 at 6.

[73] Tr. 07/31/2018 at 6.

[74] Tr. 07/31/2018 at 138.

[75] Tr. 07/31/2018 at 139-144.

[76] Tr. 7/31/2018 at 144.

[77] Tr. 07/31/2018 at 144.

concentrate and my body is shaking."[78] The judge responded: "This is your opportunity as a citizen of the United States to sit and take part in this and you don't want to do that?... Because you're nervous. You think everybody else is not nervous?"[79] Ms. Winter informed the court that her nervousness was a result of having been the victim of a robbery the previous year, in Las Vegas.[80] She described feeling traumatized, a fear of walking alone, and hypervigilance.[81] As a result of the incident, Ms. Winter did not feel she could be fair and impartial.[82] The judge responded with incredible hostility to the situation:

> THE COURT: I don't think you're being fair to the others. So I've had it up to here with people trying to get off this jury. And you will do 300 hours of community service. You be back here every day at 9 o'clock and bring me – you'll be back tomorrow at 9 o'clock and you'll bring me proof of what your – where you're going to do your community service. Thank you. You're excused. Failure to do it, I'll issue a warrant for your arrest."[83]

After the incident with Ms. Winter, which took place in open court, the court continued with voir dire until a full jury was seated.

These additional interactions demonstrated a hostile attitude from the judge towards the jury that was likely to bias proceedings against Durr. As a defendant, Durr had a constitutional right to an impartial jury, and voir dire is an essential step in composing such a jury. The judge's conduct was especially egregious considering

---

[78] Tr. 07/31/2018 at 145.

[79] Tr. 07/31/2018 at 145.

[80] Tr. 07/31/2018 at 146.

[81] Tr. 07/31/2018 at 147.

[82] Tr. 07/31/2018 at 147.

[83] Tr. 07/31/2018 at 147-148.

Judge Smith berated a juror for admitting she could not be fair and impartial, making it likely other jurors would keep similar feelings to themselves, prejudicing Durr. Judge Smith's comments, criticizing and berating potential jurors, demonstrated at best complete disregard for Durr's constitutional rights and at worst a predisposition against Durr. Either way, the judge's comments gave the appearance of bias against Durr, which was communicated to the jury. Judge Smith signaled to the jury through his behavior that Durr's right to have jurors that were fair and impartial, and that were able to fully participate in proceedings, did not matter.

### Trial

The judge's bias against the defense continued to be on display during trial. For example, in a discussion between Claus, the prosecutor, and the court about limitations on Matthews's testimony, the judge told Claus, "I assume that you're going to ask questions that will try to confuse him and he'll make statements of why he's in custody."[84] This was after Claus told the court that he did not intend to open the door to that prohibited issue, and asked that the State admonish Matthews about topics to avoid.[85] The judge's comment to Claus was not only rude, but unreasonably called into question Claus's integrity, and showed the judge's unfavorable predisposition towards the defense.

Just a few minutes later, Judge Smith shifted his hostility to Durr's family. The judge told counsel, "A lot of the defendant's family is here. I want them watched." He continued, "I want him [the bailiff] to watch the family. And if there's any problem, if there's any signs, if there's any vale [veiled] threats to the witness—I'm going to put them in custody."[86] The State interjected to renew their request from the previous

---

[84] Tr. 08/01/2018 at 32.

[85] Tr. 08/01/2018 at 31.

[86] Tr. 08/01/2018 at 33.

day that the courtroom be closed during Matthew's testimony as a way to resolve the issue, which the judge agreed to.[87] The State's motion underscores the fact that if there was a real threat to Matthews, there was a less inflammatory way to resolve the potential problem than threatening to jail Durr's family members. However, there is nothing in the record indicating that Durr's family had ever made any threats against Matthews or had any intention of doing so. The judge's comments that they must be watched, and that he was already considering the possibility of putting them in custody, showed a bias against Durr that extended to his family.

Next, Judge Smith turned his hostility towards Durr himself. After the judge determined that the courtroom would be cleared for Matthews's testimony, the following exchange happened:

> THE COURT: And I don't know why you keep turning around and looking through the courtroom, Mr. Durr, you are to look forward and that's all. Do you understand me?
>
> THE DEFENDANT: [No audible response.]
>
> THE COURT: I can get Duct tape out and take care of it. But I don't want to have to do that. Is that understood?
>
> THE DEFENDANT: Yes.[88]

This comment was not only inappropriate and uncalled for, but also showed unwarranted hostility towards Durr. Even more concerningly, the judge knew that this type of comment was indicative of bias, or at least gave the appearance of bias, as he was reprimanded by the Nevada Supreme Court less than one week prior to this incident for threatening to duct tape a different defendant's mouth. *See In re the Honorable Douglas E. Smith*, Nevada Commission on Judicial Discipline, Case No.

---

[87] Tr. 08/01/2018 at 33.

[88] Tr. 08/01/2018 at 34.

2016-068, Stipulation and Order of Consent to Discipline at 2 (Jul. 26, 2018).[89] That reprimand resulted from another case in which the defendant was represented by Claus.[90] As part of that reprimand, Judge Smith admitted that his conduct violated several rules of the Revised Nevada Code of Judicial Conduct including, but not limited to, Rule 1.2 (failing to act at all times in a matter that promotes public confidence in the independence, integrity, and impartiality of the judiciary and avoiding impropriety and the appearance of impropriety); Rule 2.2 (failing to perform all duties fairly and impartially ); and Rule 2.3(B) (failing to refrain from manifesting bias, prejudice, and harassment).[91]

The judge's bias and hostility to the defense continued the following day, during the testimony of Charlene Hanks, Matthews's girlfriend at the time of the incident. Claus attempted to engage in a line of questioning with Hanks with the goal of showing that the meet up between Matthews and Durr was a drug sale, and that Matthews sold marijuana.[92] The State objected to the line of questioning and asked to approach for a bench conference, which the judge granted.[93] The court determined that whether Matthews worked or was selling drugs was not relevant.[94]

Shortly thereafter, Claus was cross-examining Hanks about deleting text messages from her phone related to Matthews's scheme to catfish the robber with provocative photos of Hanks to trick him into showing up for Matthews to confront (which ultimately resulted in a shootout).[95] Hanks admitted that both she and

---

[89] Ex. 2: 07/27/2018 Stipulation and Order of Consent to Discipline.

[90] Ex. 2: 07/27/2018 Stipulation and Order of Consent to Discipline at 2.

[91] Ex. 2: 07/27/2018 Stipulation and Order of Consent to Discipline at 1.

[92] Tr. 08/02/2018 at 29.

[93] Tr. 08/02/2018 at 30-32.

[94] Tr. 08/02/2018 at 32.

[95] Tr. 08/02/2018 at 35.

Matthews had deleted those messages. Claus clarified that he wanted to be very specific, that he was asking Hanks about the text messages leading up to the shooting.[96] The judge interjected: "I let this go a little bit. But what you're saying is just like the question of, when you're drunk, did you hit your wife? And you don't know how to answer it. You just said, when the messages were destroyed, you destroyed them."[97] Claus responded that Hanks had already testified to the destruction of the messages. The judge responded "no, no. You used the word destroyed. She said I erased them but I do it all the time."[98]  The judge then acknowledged that there was not a difference between erase and destroy, but said that Claus "can't use the word destroyed."[99] The judge accused Claus of editorializing by saying destroyed, when Ms. Hanks said delete.[100] This whole exchange occurred in the presence of the jury. At that point, Claus asked to approach for a bench conference, as counsel for the State had done shortly before, but Claus's request was denied.[101] After the bench conference was denied, Claus moved for a mistrial, simply saying "the editorialization that's going on here is not coming from me."[102] The judge did not rule on the motion for mistrial, and Claus returned to questioning Ms. Hanks.[103]

The judge continued his inappropriate editorialization throughout the cross-examination of Detective Nicholas Brigandi. Claus asked Brigandi a yes or no

---

[96] Tr. 08/02/2018 at 36.

[97] Tr. 08/02/2018 at 36.

[98] Tr. 08/02/2018 at 36.

[99] Tr. 08/02/2018 at 36.

[100] Tr. 08/02/2018 at 36.

[101] Tr. 08/02/2018 at 36-37.

[102] Tr. 08/02/2018 at 37.

[103] Tr. 08/02/2018 at 37.

question related to Matthews trying to avoid the police, and Brigandi was resistant to answering with yes or no. When Brigandi failed to answer the question, instead starting a narrative answer, Claus sought help from the court, but the court refused to order Brigandi to answer yes or no.[104] Brigandi continued to resist answering yes or no to Claus's questions. The court responded by admonishing Claus, in front of the jury: "you're not—stop. You're not going to talk to people that way. Now you can be polite and ask the question and expect the answer, but you don't have to editorialize yourself. I've told you that throughout."[105] Claus responded that he was trying to ask a question, to which the court responded, "well, then ask the question. You don't have to be that way about it."[106] At that point, Claus gave up and passed the witness.[107]

On recross, Brigandi continued to be difficult in response to Claus. Claus again sought help from the court, to order Brigandi to answer questions as posed, saying that the witness was becoming unmanageable.[108] In response, the judge offered his own testimony:

> THE COURT: Okay. Here's the problem, and I will get to that and he will answer your question. The problem is there's a lead detective that is in charge of certain things and then there's other detectives to do a lot of other things. A lot of people are involved in it. He may not have been that one that was—and I know you think the police agents are responsible for everything and they're not. They have specific duties and responsibilities. But go ahead and ask the question again and I'll tell him to answer it.[109]

---

[104] Tr. 08/03/2018 at 57.

[105] Tr. 08/03/2018 at 57-58.

[106] Tr. 08/03/2018 at 58.

[107] Tr. 08/03/2018 at 58.

[108] Tr. 08/03/2018 at 63.

[109] Tr. 08/03/2018 at 63.

Rather than simply order the witness to answer the question, the judge inappropriately offered his personal views about the functioning of police teams, Claus's opinion of police, and the detective's testimony. Such commentary is not the purview of a neutral arbiter and again showed the judge's bias against the defense. Brigandi continued to fail to directly answer questions.[110] Rather than order Brigandi to answer appropriately, the judge commented on his testimony, saying "he's trying to help you" to Claus on two occasions.[111] The judge's behavior throughout Brigandi's testimony showed his bias. Rather than help the defense manage a difficult witness, the judge editorialized about Brigandi's helpfulness, offered his own views about police, and criticized Claus in front of the jury, again exhibiting hostility and an unfavorable disposition towards Durr and the defense.

The judge's bias against Durr, and its impact on the case, was apparent at sentencing. The judge sentenced Durr to life without the possibility of parole despite the fact that the State only sought a sentence of 10 to life as a large habitual.[112] Parole and Probation did not even recommend sentencing Durr as a habitual.[113]

The judge's bias against Durr was apparent throughout the trial and directly impacted the case and outcome in several ways. Judge Smith was hostile to Durr and his counsel, both in front of the jury and outside their presence. His bias further impacted Durr's case because he tainted the jury with his inappropriate and hostile behavior. Finally, Durr's extreme sentence was also a result of the judge's bias against him. Judge Smith's bias caused Durr to be denied his due process right to a

---

[110] Tr. 08/03/2018 at 64. Claus asked Brigandi if he conveyed to another detective that Matthews fired 15 shots. Rather than answering "yes" or "no", Brigandi again began a narrative answer.

[111] Tr. 08/03/2018 at 64, 66.

[112] Tr. 10/01/2018 at 3.

[113] Tr. 10/01/2018 at 2.

fair trial. If Durr had an unbiased judge, there is a reasonable probability that the outcome of Durr's proceedings would have been different. Any contrary decision by a state court would be contrary to, or an unreasonable application of, clearly established federal law, and/or would involve an unreasonable determination of the facts.   See 28 U.S.C. 2254(d)(1) and (2).   The writ should be granted, and the conviction and sentence should be vacated.

**Ground Seven: Durr received ineffective assistance of trial counsel in violation of the Sixth and Fourteenth Amendments.**

**Statement of Exhaustion:** Ground Seven and all and its subparts are new claims.

The Sixth Amendment to the United States Constitution guarantees criminal defendants the effective assistance of counsel at trial. The standard for evaluating an ineffectiveness claim for trial counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a showing that counsel's performance fell below an objective standard of professional care, and that there was a reasonable probability the outcome would have been different absent the deficient performance. Durr's trial counsel, Augustus Claus, performed deficiently at various critical stages of Durr's proceedings.   Taken individually, or collectively, Claus's deficient performance violated Durr's right to counsel, and it is likely that the result of his proceedings would have been different if Claus had performed effectively.

### A.   Trial counsel was ineffective for failing to protect Durr from a tainted jury after judge Douglas Smith berated a potential juror in front of the jury pool.

The Sixth Amendment of the United States Constitution guarantees criminal defendants the right to be tried by an impartial jury. The Supreme Court has held that "part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). "Without an adequate voir dire[,] the trial judge's responsibility to remove prospective

jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Id.* at 729-30, quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion). Even in the absence of a showing of actual bias, "circumstances that create the likelihood or appearance of bias" during voir dire deprive the defendant the right to an impartial jury. *Peters v. Kiff*, 407 U.S. 493, 502 (1972). Trial counsel was ineffective for failing to move to strike a tainted jury.

Durr was denied his right to an impartial jury when the trial judge conducted a voir dire that fell below adequate judicial standard.[114] During voir dire, prospective juror Irene Winter expressed feeling "nervous all day long" and reported that her body was shaking.[115] When the State asked Winter to clarify why she felt nervous, she explained that she had been the victim of a robbery, the underlying charge of the Durr case, the prior year in Las Vegas.[116] Describing how she felt traumatized still by the experience, Winter said she did not believe that she could be fair and impartial.[117]

In response to her confirmation that she did not feel that she could be impartial, the trial judge berated her in front of the venire.[118] Trial judge Doug Smith accused her of not "being fair" to the other jurors and proclaimed that he "had it up to here with people trying to get off [the] jury."[119] To reinforce his sentiment, the trial judge ordered Winter to complete "300 hours of community service…[and to come]

---

[114] *See* NCJC Canon 2, Rule 2.8(B) (stating that "a judge shall be patient, dignified, and courteous…to jurors").

[115] Tr. 07/31/2018 at 145.

[116] Tr. 07/31/2018 at 146.

[117] Tr. 07/31/2018 at 147.

[118] Tr. 07/31/2018 at 147.

[119] Tr. 07/31/2018 at 147.

back [to court] every day at 9 o'clock."[120] As he excused Winter, trial judge Smith stated that he would issue a warrant for her arrest if she failed to follow his orders.[121] Winter recalls that even now, five years later, it causes her anxiety to think about this interaction with Judge Smith.[122]

Trial judge Smith's conduct was beyond the pale. When an impartial jury is not produced through a proper voir dire, the court has committed a structural error. *Barral v. State*, 131 Nev. 520, 523 (2015). Since a structural error affects at least one of the defendant's substantial rights, the Court must analyze the error on the basis that it is "intrinsically harmful." *Id.* (quoting *Cortinas v. State*, 124 Nev. 1013, 1024 (2008)). As an intrinsically harmful error, a criminal trial conducted without an impartial jury "require[s] automatic reversal…without regard to the effect on the outcome." *Id.*

The trial judge has a responsibility to impanel an impartial jury through an evaluation of the prospective jurors' responses to questions and demeanor. *Rosales-Lopez v. United States*, 451 U.S. 182, 188-89 (1981). Throughout this evaluation, the trial judge is required to "be patient, dignified, and courteous to…jurors." *Azucena v. State*, 135 Nev. 269, 272 (2019) (quoting NCJC Canon 2, Rule 2.8(B)). This requirement stems from the likelihood that the "judge's words and conduct…'mold[s] the opinion of the members of the jury to the extent that one or the other side of the controversy may be prejudiced.'" *Id.* (quoting *Parodi v. Washoe Med. Ctr., Inc.*, 111 Nev. 365, 367-68 (1995)). When a judge creates an "atmosphere of intimidation" and does nothing to reduce the impact of this environment during voir dire, the impartiality of the jury is unassured. *Id.* at 274. In *Azucena*, the trial judge accused

---

[120] Tr. 07/31/2018 at 147-48.

[121] Tr. 07/31/2018 at 148.

[122] Ex. 4: Declaration of Irene Winter.

a prospective juror of "try[ing] to make shit up" to get out of jury service when she expressed uncertainty about being unbiased toward the defendant because of her own exposure to the type of alleged crimes working as a nurse with children. *Id.* at 269 & 272-73. During this accusation, the judge yelled at the prospective juror and threw a book against the wall before excusing her from the jury. *Id.* at 270. The trial judge then promptly continued voir dire, producing uncertainty about the impartiality of the jury selected. *Id.* at 271.

The same was true here. After the confrontation with Ms. Winter, Judge Smith continued voir dire without explaining his conduct to the jury.[123] By failing to mitigate the atmosphere of intimidation that he had created, trial judge Smith tainted the prospective juror pool by producing a chilling effect: the remaining prospective jurors feared reprisal for being forthcoming and honest, having just witnessed one such prospective juror be punished with community service and potential arrest for such candor. When prospective jurors are given cause to fear reprisals for truthful answers, their respective answers to questions of voir dire cannot be presumed to be truthful. *United States v. Rowe*, 106 F.3d 1226, 1229 (5th Cir. 1997). In *Rowe*, the trial judge punished one prospective juror with an order to "com[e] back [to court] again, and again, and again…" when she expressed concern about being impartial given the nature of the charge and her relationship to a narcotics officer. *Id.* at 1228. Having berated and punished both this prospective juror and another who also expressed uncertainty about being impartial in the matter of the case such that the remainder of the venire could hear it, the trial judge produced an atmosphere in which the venire's members did not feel that they could be candidly honest in response to questions for fear of similar punishment. *Id.* at 1229-30. When a trial judge fails to reduce the impact of the atmosphere of intimidation he has

---

[123] Tr. 07/31/2018 at 148.

produced during voir dire, the entire venire has been tainted. *Id.* at 274. Despite the judge's intention to merely reprimand the sole respective prospective juror being berated, his words and demeanor have a "chilling effect" on the entire venire. *Id.* at 271.

Claus did not object to the trial judge's conduct, nor did he move to strike the venire based on the structural error of the tainted jury pool. The trial judge's substandard conduct with the venire produced, at a minimum, a trial jury that had the appearance of bias. Furthermore, the likelihood of bias was also apparent since the remaining prospective jurors probably reacted accordingly to the trial judge's visible and vocal condemnation of another prospective juror's candid expression of uncertainty about being impartial. To rectify the likelihood that the remaining prospective jurors were less forthcoming in their responses to voir dire questioning, defense counsel should have moved to strike the venire and replace it with a pool of prospective jurors who had not been tainted by the trial judge's hostile conduct. Trial counsel's failure to object amounted to deficient performance.

Trial counsel's deficient performance prejudiced Durr. It is likely that a new venire would have been compiled had defense counsel effectively objected to the trial judge's creation of an atmosphere of intimidation, following his berating of prospective juror Winter. In turn, it is likely that Durr would have been tried by an impartial jury impaneled from this new venire. With a new jury, there is a reasonable probability that Durr would have been acquitted on all charges against him.

**B.    Trial counsel was ineffective for failing to seek recusal or a mistrial due to judicial bias of judge Douglas Smith.**

A judge demonstrates improper bias when she performs incompatible accusatory and judicial roles. *See In re Murchison,* 349 U.S. 133, 137 (1955). A judge may not act as a prosecutor nor seek to advance the position of the prosecution. *Crater v. Galaza*, 491 F.3d 1119, 1132 (9th Cir. 2007). Furthermore, opinions formed by a

judge, even on the basis of facts introduced in the course of proceedings, can constitute bias where they "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States,* 510 U.S. 540, 555, (1994). The Supreme Court has held that "a favorable or unfavorable predisposition can also deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment." *Id.* at 551. Recusal is required in such circumstances whether or not the bias arises from an extrajudicial source or evidence in the present proceedings. *United States v. Robertson*, 121 F.3d 719 (9th Cir. 1997). Furthermore, judicial bias is a structural defect, therefore, prejudice need not be proven. *Coley v. Bagley*, 706 F.3d 741,750 (6th Cir. 2013).

Trial judge Douglas Smith demonstrated bias against Durr and the defense team throughout Durr's proceedings beginning with jury selection and continuing through the trial and sentencing. Trial counsel was ineffective for failing to move for a mistrial and/or recusal based on the conduct of Judge Smith.

### Voir Dire

Judge Douglas Smith was hostile and rude throughout jury selection. In a bench conference about a juror that did not speak fluent English, the judge told counsel that this was the worst jury panel he ever had in 32 years.[124] He did not keep his dissatisfaction between himself and counsel.  When Judge Smith dismissed the juror in question, he made a comment in front of the rest of the jury about the juror's lack of English fluency: "How could you be here 30 years and not speak English, brother, I don't understand."[125] Later that same day, Claus moved to strike for-cause

---

[124] Tr. 07/30/2018 at 223-224.

[125] Tr. 07/30/2018 at 225.

37

another juror who admitted to not being fluent in English and seemed to have some difficulty understanding English, but the judge refused to do so.[126]

> MR. CLAUS: Do you believe that your English – that your grasp of English is sufficient to understand everything that is said here in the courtroom?
>
> PROSPECTIVE JUROR NO. 153: Not everything.
>
> MR. CLAUS: Do you believe that your English is sufficient to understand all the evidence that will be offered here?
>
> PROSPECTIVE JUROR NO. 153: Not everything.
>
> MR. CLAUS: Okay. Based upon that, do you believe that you should serve as a juror here?
>
> PROSPECTIVE JUROR NO. 153: As I say, yes, the judge decide.
>
> MR. CLAUS: Okay.
>
> THE COURT: I'm leaving him on.[127]

Despite the prospective juror admitting that he would not entirely understand the courtroom proceedings or evidence, the judge inexplicably refused to strike the juror for cause. But the issue did not end there. The following day, before voir dire continued, Claus renewed his request to strike Juror 153 due to his inability to sufficiently understand English. Claus brought up several incidents demonstrating Juror 153's difficulty with comprehension.[128] The judge responded by claiming that Claus was prejudiced against Hispanic people: "a lot of them have made—made that

---

[126] Tr. 07/30/2018 at 246-247, 250.

[127] Tr. 07/30/2018 at 250-251.

[128] Tr. 07/31/2018 at 5. Claus explained that Juror 153 initially answered no to the questions of whether he had ever served as a juror and whether he had been the victim of a crime. But later, during Claus's venire, he revealed he had been robbed by two people and had been a juror in a civil case.

[mistake]. And you've not brought that objection up except for this Spanish speaker. The English ones, there was a couple of English ones that made that same mistake. And you've not bringing that up. It sounds to me like you're a little biased."[129] Claus responded by explaining why Juror 153's misunderstandings were different ("with the English speakers they clearly indicated that the reason why they miscommunicated is because they misunderstood my question").[130] Claus then shot back at the judge: "Your Honor, what we're talking about here is you've accused me of being biased against a Spanish speaker. I find that particularly hilarious when you're looking at sending Mr. Durr away for some amount of time if he's convicted of anything."[131] This exchange between the trial judge and defense counsel (started by the judge), where each said the other is biased, is completely inappropriate and demonstrated hostility by the judge towards the defense. Further, the resulting conflict further heightened the appearance of impermissible bias against the defense.

Later that day, during continued voir dire, the trial judge had more hostile interactions with the jury panel. Another juror, Prospective Juror 169, told the court he had not understood proceedings and was not fluent in English.[132] The subsequent conversation between the State and Juror 169 revealed confusion.[133] The judge let the juror go, saying "who the hell comes to the United States if they're not going to take care of business."[134] Following this exchange, the court clerk called Prospective Juror 176, Irene Winter, to fill the vacated seat.[135]

---

[129] Tr. 07/31/2018 at 5.

[130] Tr. 07/31/2018 at 6.

[131] Tr. 07/31/2018 at 6.

[132] Tr. 07/31/2018 at 138.

[133] Tr. 07/31/2018 at 139-144.

[134] Tr. 7/31/2018 at 144.

[135] Tr. 07/31/2018 at 144.

Ms. Winter informed the court that she has been extremely nervous all day sitting in the court "[m]y heart is – palpitation so hard. And it's like I cannot concentrate and my body is shaking."[136] The judge responded: "This is your opportunity as a citizen of the United States to sit and take part in this and you don't want to do that?... Because you're nervous. You think everybody else is not nervous?"[137] Ms. Winter informed the court that her nervousness was a result of having been the victim of a robbery the previous year, in Las Vegas.[138] She described feeling traumatized, a fear of walking alone, and hypervigilance.[139] As a result of the incident, Ms. Winter did not feel she could be fair and impartial.[140] The judge responded with incredible hostility to the situation:

> THE COURT: I don't think you're being fair to the others. So I've had it up to here with people trying to get off this jury. And you will do 300 hours of community service. You be back here every day at 9 o'clock and bring me – you'll be back tomorrow at 9 o'clock and you'll bring me proof of what your – where you're going to do your community service. Thank you. You're excused. Failure to do it, I'll issue a warrant for your arrest."[141]

After the incident with Ms. Winter, which took place in open court, the court continued with voir dire until a full jury was seated.

These additional interactions demonstrated a hostile attitude from the judge towards the jury, that was likely to bias proceedings against Durr. The judge's

---

[136] Tr. 07/31/2018 at 145.

[137] Tr. 07/31/2018 at 145.

[138] Tr. 07/31/2018 at 146.

[139] Tr. 07/31/2018 at 147.

[140] Tr. 07/31/2018 at 147.

[141] Tr. 07/31/2018 at 147-148.

conduct was especially egregious considering he responded with hostility to a prospective juror's admission that she could not be fair and impartial, making it likely other prospective jurors would keep similar feelings to themselves. As a defendant, Durr had a constitutional right to an impartial jury, and voir dire is an essential step in composing such a jury. Judge Smith's comments, criticizing and berating potential jurors, shows, at best, complete disregard for Durr's constitutional rights and at worst a predisposition against Durr. Either way, the judge's comments gave the appearance of bias against Durr, which was communicated to the jury. Judge Smith signaled to the jury through his behavior that Durr's right to have jurors that were fair and impartial, and that could fully participate in proceedings, did not matter.

**Trial**

The judge's bias against the defense continued to be on display during trial. For example, in a discussion between Claus, the prosecutor, and the court about limitations on Matthews's testimony, the judge told Claus, "I assume that you're going to ask questions that will try to confuse him and he'll make statements of why he's in custody."[142] This was after Claus told the court that he did not intend to open the door to that prohibited issue, and asked that the State admonish Matthews about topics to avoid.[143] The judge's comment to Claus was not only rude, but unreasonably called into question Claus's integrity, and showed the judge's unfavorable predisposition towards the defense.

Just a few minutes later, the judge shifted his hostility to Durr's family. The judge told counsel, "A lot of the defendant's family is here. I want them watched." He continued, "I want him [the bailiff] to watch the family. And if there's any problem, if there's any signs, if there's any vale [veiled] threats to the witness—I'm going to put

---

[142] Tr. 08/01/2018 at 32.

[143] Tr. 08/01/2018 at 31.

them in custody."[144]   The State interjected to renew the State's request from the previous day that the courtroom be closed during Matthew's testimony as a way to resolve the issue, which the judge agreed to.[145] The State's motion underscores the fact that if there was a real threat to Matthews, there was a less inflammatory way to resolve the potential problem than threatening to jail Durr's family members. However, there is nothing in the record indicating that Durr's family had ever made any threats against Matthews or had any intention of doing so. The judge's comments that they must be watched, and that he was already considering the possibility of putting them in custody, showed a bias against Durr that extended to his family.

Next, Judge Smith turned his hostility towards Durr himself. After the judge determined that the courtroom would be cleared for Matthews's testimony, the following exchange happened:

> THE COURT: And I don't know why you keep turning around and looking through the courtroom, Mr. Durr, you are to look forward and that's all. Do you understand me?
>
> THE DEFENDANT: [No audible response.]
>
> THE COURT: I can get Duct tape out and take care of it. But I don't want to have to do that. Is that understood?
>
> THE DEFENDANT: Yes.[146]

This comment was not only inappropriate and uncalled for, but also showed unwarranted hostility towards Durr. Even more concerningly, the judge knew that this type of comment was indicative of bias, or at least gave the appearance of bias,

---

[144]Tr. 08/01/2018 at 33.

[145] Tr. 08/01/2018 at 33.

[146] Tr. 08/01/2018 at 34.

as he was reprimanded by the Nevada Supreme Court less than one week prior to this incident for threatening to duct tape a different defendant's mouth. *See In re the Honorable Douglas E. Smith*, Nevada Commission on Judicial Discipline, Case No. 2016-068, Stipulation and Order of Consent to Discipline at 2 (Jul. 26, 2018).[147] That reprimand resulted from another case in which the defendant was represented by Claus.[148]  As part of that reprimand, Judge Smith admitted that his conduct violated several rules of the Revised Nevada Code of Judicial Conduct including, but not limited to, Rule 1.2 (failing to act at all times in a matter that promotes public confidence in the independence, integrity, and impartiality of the judiciary and avoiding impropriety and the appearance of impropriety); Rule 2.2 (failing to perform all duties fairly and impartially ); and Rule 2.3(B) (failing to refrain from manifesting bias, prejudice, and harassment).[149]

The judge's bias and hostility to the defense continued the following day, during the testimony of Charlene Hanks, Matthews's girlfriend at the time of the incident. Claus attempted to engage in a line of questioning with Hanks with the goal of showing that the meet up between Matthews and Durr was a drug sale, and that Matthews sold marijuana.[150] The State objected to the line of questioning and asked to approach for a bench conference, which the judge granted.[151] The court determined that whether Matthews worked or was selling drugs was not relevant.[152]

Shortly thereafter, Claus was cross-examining Hanks about deleting text messages from her phone related to Matthews's scheme to catfish the robber with

---

[147] Ex. 2: 07/26/2018 Stipulation and Order of Consent to Discipline.

[148] Ex. 2: 07/26/2018 Stipulation and Order of Consent to Discipline at 2.

[149] Ex. 2: 07/26/2018 Stipulation and Order of Consent to Discipline at 1.

[150] Tr. 08/02/2018 at 29.

[151] Tr. 08/02/2018 at 30-32.

[152] Tr. 08/02/2018 at 32.

provocative photos of Hanks to trick him into showing up for Matthews to confront (which ultimately resulted in a shootout).[153] Hanks admitted that both she and Matthews had deleted those messages. Claus clarified that he wanted to be very specific, that he was asking Hanks about the text messages leading up to the shooting.[154] The judge interjected: "I let this go a little bit. But what you're saying is just like the question of, when you're drunk, did you hit your wife? And you don't know how to answer it. You just said, when the messages were destroyed, you destroyed them."[155] Claus responded that Hanks had already testified to the destruction of the messages. The judge responded "no, no. You used the word destroyed. She said I erased them but I do it all the time."[156]  The judge then acknowledged that there was not a difference between erase and destroy, but said that Claus "can't use the word destroyed."[157] The judge accused Claus of editorializing by saying destroyed, when Ms. Hanks said delete.[158] This whole exchange occurred in the presence of the jury. At that point, Claus asked to approach for a bench conference, as counsel for the State had done shortly before, but Claus's request was denied.[159] After the bench conference was denied, Claus moved for a mistrial, simply saying "the editorialization that's going on here is not coming from me."[160] The judge

---

[153] Tr. 08/02/2018 at 35.

[154] Tr. 08/02/2018 at 36.

[155] Tr. 08/02/2018 at 36.

[156] Tr. 08/02/2018 at 36.

[157] Tr. 08/02/2018 at 36.

[158] Tr. 08/02/2018 at 36.

[159] Tr. 08/02/2018 at 36-37.

[160] Tr. 08/02/2018 at 37.

did not rule on the motion for mistrial, and Claus returned to questioning Ms. Hanks.[161]

The judge continued his inappropriate editorialization throughout the cross-examination of Detective Nicholas Brigandi. Claus asked Brigandi a yes or no question related to Matthews trying to avoid the police, and Brigandi was resistant to answering with yes or no. When Brigandi failed to answer the question, instead starting a narrative answer, Claus sought help from the court, but the court refused to order Brigandi to answer yes or no.[162] Brigandi continued to resist answering yes or no to Claus's questions. The court responded by admonishing Claus, in front of the jury: "you're not—stop. You're not going to talk to people that way. Now you can be polite and ask the question and expect the answer, but you don't have to editorialize yourself. I've told you that throughout."[163] Claus responded that he was trying to ask a question, to which the court responded, "well, then ask the question. You don't have to be that way about it."[164] At that point, Claus gave up and passed the witness.[165]

On recross, Brigandi continued to be difficult in response to Claus. Claus again sought help from the court, to order Brigandi to answer questions as posed, saying that the witness was becoming unmanageable.[166] In response, the judge offered his own testimony:

> THE COURT: Okay. Here's the problem, and I will get to that and he will answer your question. The problem is there's a lead detective that is in charge of certain things and then there's other detectives to do a lot of other things. A lot of people are involved

---

[161] Tr. 08/02/2018 at 37.

[162] Tr. 08/03/2018 at 57.

[163] Tr. 08/03/2018 at 57-58.

[164] Tr. 08/03/2018 at 58.

[165] Tr. 08/03/2018 at 58.

[166] Tr. 08/03/2018 at 63.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

> in it. He may not have been that one that was—and I know you think the police agents are responsible for everything and they're not. They have specific duties and responsibilities. But go ahead and ask the question again and I'll tell him to answer it.[167]

Rather than simply order the witness to answer the question, the judge inappropriately offered his own testimony about the functioning of police teams, Claus's opinion of police, and the detective's testimony. Such commentary is not the purview of a neutral arbiter, and again showed the judge's bias against the defense. Brigandi continued to fail to directly answer questions.[168] Rather than order Brigandi to answer appropriately, the judge commented on his testimony, saying "he's trying to help you" to Claus on two occasions.[169] The judge's behavior throughout Brigandi's testimony showed his bias. Rather than help the defense manage a difficult witness, the judge editorialized about Brigandi's helpfulness, offered his own views about police, and criticized Claus in front of the jury, again exhibiting hostility towards Durr and the defense.

The judge's bias against Durr, and its impact on the case, was apparent at sentencing. The judge sentenced Durr to life without the possibility of parole despite the fact that the State only sought a sentence of 10 to life as a large habitual.[170] Parole and Probation did not even recommend sentencing Durr as a habitual.[171]

Despite a plethora of inappropriate, hostile behavior by the judge towards Durr himself and his counsel, Claus never directly raised the issue of judicial bias. He did

---

[167] Tr. 08/03/2018 at 63.

[168] Tr. 08/03/2018 at 64. Claus asked Brigandi if he conveyed to another detective that Matthews fired 15 shots. Rather than answering "yes" or "no", Brigandi again began a narrative answer.

[169] Tr. 08/03/2018 at 64, 66.

[170] Tr. 10/01/2018 at 3.

[171] Tr. 10/01/2018 at 2.

46

not object to judicial bias, seek a mistrial on that basis, or seek recusal of Judge Smith even though the law would have supported such actions. This was ineffective performance by Claus. Any reasonable attorney would not have continued to put up with such hostility from the judge without doing anything to protect their client. Had Claus raised the issue of judicial bias, it's likely that he would have been able to obtain a mistrial and a new judge. If he had, there was a reasonable probability that the outcome of Durr's proceedings would have been different.

### C. Trial counsel was ineffective for failing to investigate the identity of the alleged unknown coconspirator D.

The State and Durr agreed that the person that entered Matthews's car, stole his belongings, and pulled a gun on him was not Durr.[172] It was an allegedly unknown acquaintance of Durr, that he knew as D, and the State feigned knowing nothing about. In the indictment, the State included conspiracy and aiding and abetting theories for each charge, alleging that Durr acted with an "unknown individual".[173] However, the State did know the identity of D, and learned this information at some point before December 28, 2017.[174] On January 3, 2018, the Clark County Public Defender's Office filed a motion to withdraw from representation of Durr due to a conflict, accompanied by an affidavit dated December 28, 2017 from assistant public defender Kelli M. Devaney-Sauter, attesting that the office could not represent Durr because they had represented the "unknown co-conspirator" Devon Freeman.[175] In her affidavit, Ms. Devaney-Sauter indicated that detectives determined the unknown co-conspirator to be Devon Freeman, through subsequent investigation.[176] Detectives

---

[172] Tr. 08/03/2018 at 184.

[173] 11/15/2017 Indictment.

[174] 01/03/2018 Motion to Withdraw Due to Conflict.

[175] 01/03/2018 Motion to Withdraw Due to Conflict at 2.

[176] 01/03/2018 Motion to Withdraw Due to Conflict at 2.

had previously indicated they were investigating D's identity by searching Durr's phone.[177] It appears that detectives did learn the identity of D, as Devon Freeman, but failed to amend the indictment to correct the fact that the alleged unknown individual was no longer unknown.

The prosecutors were also aware that D's identity was discovered. Presumably the detectives kept prosecutors apprised of the investigation, but even if they did not, the Clark County District Attorney's office was served with the motion to withdraw,[178] and present at the hearing on the motion.[179] After withdrawal was granted due to the conflict, Claus was appointed to represent Durr. Importantly, the case had been proceeding in front of Judge Douglas Herndon, but was later transferred to Judge Douglas Smith[180], so Judge Smith may not have been aware that the State knew the identity of Devon Freeman.

It appears Claus was never informed of Devon Freeman's identity, or given any information related to the investigation of Freeman. However, it's possible that Claus could have discovered the identity of Devon Freeman had he done further investigation. If Claus had looked into the reason he was appointed as conflict counsel, he could have discovered D's identity, and from there done more investigation to find Devon Freeman. He also could have requested information from the State about their investigation of Freeman. It was ineffective for Claus to fail to investigate the identity of Freeman because he was critical to both the allegations and the defense.

---

[177] Ex. 1: 10/31/2017 Temporary Custody Record; Declaration of Arrest at 13.

[178] 01/03/2018 Motion to Withdraw Due to Conflict at 5.

[179] Tr. 01/11/2018.

[180] *See* Tr. 6/19/2018; Tr. 07/19/2018.

If Durr had had information about D's identity, he could have found him and interviewed him, and potentially subpoenaed him for the defense. Investigator Maribel Yanez, of the Federal Public Defender's Office was able to find Freeman during the course of investigation.[181] Trial counsel also could have discovered whether any deals had been made between the State and Freeman that would explain the fact that Freeman had not even been arrested for this crime despite the State knowing his identity and agreeing that he is the one who robbed Matthews.

Information about Devon Freeman's identity, and any information related to investigation of Freeman, was critical to Durr's defense and ability to prepare for trial. Claus was ineffective for failing to investigate and discover the identity of Freeman.

### D. Trial counsel was ineffective for failing to investigate Tyler Matthews.

Trial counsel Claus was ineffective for failing to investigate the alleged victim, Tyler Matthews. Claus should have investigated Matthews. Such an investigation would have been especially important given Matthews's frequently changing statements and inconsistencies.[182] Had Claus investigated Matthews, he likely would have discovered information that would have allowed him to do a more effective cross examination of Matthews. For example, Claus was caught off guard when Charlene Hanks revealed in her testimony that Matthews had specifically bought a gun the day of the shootout and told her he wanted to kill the robber.[183] However, because the judge would not allow Durr to recall Matthews in his case-in-chief, Claus had no opportunity to cross-examine him about the gun. Had Claus investigated, he could

---

[181] Ex.5: Declaration of Maribel Yanez Regarding Devon Freeman.

[182] Tr. 08/01/2018 at 112-119; 123-124 (Tyler Matthews testified he gave about 5 different voluntary statements to police).

[183] Tr. 08/02/2018 at 21.

have found this information in advance and been able to use it to impeach Claus and further demonstrate Matthews's dishonesty.

Had Claus investigated Matthews, he would have uncovered other information favorable to Durr that would have been key at trial. For example, Matthews did not believe that Durr was aware of Devon Freeman's intention to rob Matthews.[184] He believed Freeman was solely responsible for the robbery.[185] This would have undermined the State's theory that Durr aided and abetted Freeman. Matthew's testimony was crucial because he was the only witness to the robbery (other than Devon Freeman). Because the jury acquitted Durr of conspiracy to commit robbery, and because the evidence did not support a theory that Durr directly robbed Matthews, this testimony from Matthews would have been key in contradicting the aiding and abetting theory and obtaining an acquittal for Durr. If Claus had investigated Matthews, he also would have learned that Matthews chose the wrong person from a photo lineup that contained Durr's photo, shown to him by police.[186] This would have contradicted what Detective Valenzuela said to the grand jury: that Matthews was unable to pick anyone out.[187]

It's likely that if Claus had investigated Matthews and the jury had heard this helpful testimony, the jury would not have convicted Durr of the robbery. Had Claus performed effectively, there is a reasonable probability that the outcome of Durr's trial would have been different.

---

[184] Ex. 6: Declaration of Maribel Yanez Regarding Tyler Matthews.

[185] Ex. 6: Declaration of Maribel Yanez Regarding Tyler Matthews.

[186] Ex. 6: Declaration of Maribel Yanez Regarding Tyler Matthews.

[187] Tr. 11/14/2017 at 36.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

### E.   Trial counsel was ineffective throughout the sentencing hearing.

Trial counsel Claus was ineffective for failing to mitigate the likelihood that the court would impose upon Durr a sentence of life without the possibility of parole. *See Wiggins v. Smith*, 539 U.S. 510 (2003).

During voir dire, Claus claimed that trial judge Smith was "looking at sending Mr. Durr away for some amount of time, if he's convicted of anything."[188] This statement was based on the trial judge's interaction with a juror the prior day, in which he joked that he might have been the one who sent the juror's "man to prison because he wanted to be made an example of."[189] In light of the likelihood that Judge Smith would impose a harsh sentence on Durr, Claus was deficient in failing to present mitigation evidence to support a lesser sentence for Durr.

In addition to failing to present mitigation witnesses, Claus was ineffective because he failed to file a sentencing memorandum or challenge the prior convictions the State relied upon to seek the habitual punishment. Even though Claus knew that Durr was facing life without the possibility of parole, he did not file any argument in Durr's support in advance of the hearing. Further, Claus knew that Judge Smith was known for issuing harsh sentences, as he indicated in his comments during voir dire. When Judge Smith issued his sentence, Claus realized his mistake. After imposing the sentencing of life without the possibility of parole, Claus said "if you're going to make that ruling… could I ask to file a sentencing memorandum on this? I did get the Judgements of Conviction from the State, but if you're going to do an LWOP, Your Honor, then I really need to take a closer look at those and challenge them."[190] Claus's

---

[188] Tr. 07/31/2018 at 6.

[189] Tr. 07/31/2018 at 6.

[190] Tr. 10/01/2018 at 19.

desperate request was too little, too late, and he knew it. Any such memorandum should have been submitted in advance of the hearing.

Claus's deficient performance prejudiced Durr. Filing a sentencing memorandum in Durr's support to argue for a lesser sentence was critical in Durr's case, given the harsh penalties he was facing and Claus's knowledge of the judge's reputation for extreme sentences. Similarly, Claus also should have presented mitigation witnesses to counteract the prior judgments of conviction that had been filed. Durr's family attended his trial and could have testified at his sentencing hearing. Claus could have presented a different side of Durr by calling witnesses to support him and speak about his character, but he failed to do so. This left the court with one perspective of Durr, the one presented by the State. Had Claus performed effectively at sentencing, there's a reasonable probability the outcome of the hearing would have been different and Durr would not have been sentenced to life without the possibility of parole when neither the State nor Parole and Probation requested such a harsh sentence.

**F.    Trial counsel was ineffective for failing to seek resentencing or reconsideration with a different judge when Judge Douglas Smith penalized Durr for maintaining his innocence at sentencing.**

The Fifth Amendment of the United States Constitution guarantees criminal defendants the right to remain silent and be free from self-incrimination. U.S. Const. amend. V. The Supreme Court has held that a criminal defendant should "suffer no penalty…for such silence." *Estelle v. Smith*, 451 U.S. 454, 468 (1981), quoting *Malloy v. Hogan*, 378 U.S. 1, 8 (1964). This Fifth Amendment privilege protects the defendant at all stages of the criminal trial, including sentencing. *Mitchell v. United States*, 526 U.S. 314, 328-29 (1999).

At the Durr's sentencing hearing, the State asked the court to impose a sentence of 10 to life on the basis that Durr be punished as a large habitual

offender.[191] After allowing the State to make its argument, the trial judge allowed Durr to make a statement. In his statement, Durr maintained that "[he] did nothing wrong…[and] was never involved in no robbery or anything."[192] After allowing Durr and his defense counsel to make their respective statements, Judge Smith imposed a sentence of life without the possibility of parole, providing Durr's criminal history as a basis, and stating "I see you as a danger to society."[193] Judge Smith did not elaborate on why Durr's criminal history, which was the minimum required to qualify under the large habitual, caused him to give Durr the harshest possible sentence, departing from the State's request of 10-to-life, which also took into account Durr's criminal history.[194]

After the hearing, defense counsel Claus filed a motion to strike the life without the possibility of parole sentence on the basis that the sentence violated Durr's Eighth Amendment right against cruel and unusual punishment.[195] At the hearing to consider the motion, Judge Smith admitted the State's "argument [for 10 to life] was right on…spot on."[196] Despite agreeing Durr should have been sentenced to 10-to-life, trial judge Smith revealed that he "was convinced after hearing [Durr] that [he] needed to [impose the sentence to life without possibility of parole]."[197] In doing so, judge Smith admitted he only changed his mind after hearing Durr speak and maintain his innocence. That the judge sentenced Durr harshly because he

---

[191] Tr. 10/01/2018 at 3.

[192] Tr. 10/01/2018 at 6-7.

[193] Tr. 10/01/2018 at 19.

[194] Tr. 10/01/2018 at 3-6.

[195] 10/11/2018 Motion to Strike Life Without Possibility of Parole Sentence at 4-5.

[196] Tr. 10/17/2018 at 3.

[197] Tr. 10/17/2018 at 3.

maintained his innocence is the only reasonable inference to draw, as Durr was not rude or inappropriate in any way during his comments that would cause the judge to sentence him more harshly.[198] Upon the revelation that the trial judge imposed a harsher sentence based upon Durr's statements made at the sentencing hearing, defense counsel should have moved to strike the sentence on the basis that it violated Durr's Fifth Amendment right against punishment for refusing to self-incriminate, and moved for reconsideration or resentencing with a different judge.

By failing to take any action to protect Durr's Fifth Amendment rights, counsel's performance was deficient. Had Claus challenged the Judge Smith's decision, there was a reasonable probability that Durr's sentence of life without the possibility of parole would not have stood, and he would have received a lesser sentence.

**Ground Eight: Durr received ineffective assistance of appellate counsel in violation of the Sixth and Fourteenth Amendments.**

**Statement of Exhaustion:** Ground Eight and all its subparts are new claims.

The Sixth Amendment to the United States Constitution guarantees criminal defendants the effective assistance of counsel at trial. The standard for evaluating an ineffectiveness claim for trial counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a showing that counsel's performance fell below an objective standard of professional care, and that there was a reasonable probability the outcome would have been different absent the deficient performance. A defendant's federal constitutional right to effective assistance of counsel extends to a direct appeal. Durr was represented by Augustus Claus in his appellate proceedings. Claus fell below the constitutional minimum standard for effective assistance of counsel, and prejudiced Durr, in several ways. Taken individually, or collectively,

---

[198] Tr. 10/01/2018 at 6-8.

Claus's deficient performance violated Durr's right to counsel, and it is likely that the result of his appellate proceedings would have been different if Claus had performed effectively.

### A.    Appellate counsel was ineffective for failing to raise the issue of judicial bias on appeal.

Judge Douglas Smith manifested bias against Durr throughout his trial proceedings. A judge demonstrates improper bias when she performs incompatible accusatory and judicial roles. *See In re Murchison,* 349 U.S. 133, 137 (1955). A judge may not act as a prosecutor nor seek to advance the position of the prosecution. *Crater v. Galaza*, 491 F.3d 1119, 1132 (9th Cir. 2007). Furthermore, opinions formed by a judge, even on the basis of facts introduced in the course of proceedings, can constitute bias where they "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States,* 510 U.S. 540, 555, (1994). The Supreme Court has held that "a favorable or unfavorable predisposition can also deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment." *Id.* at 551. Recusal is required in such circumstances whether or not the bias arises from an extrajudicial source or evidence in the present proceedings. *United States v. Robertson*, 121 F.3d 719 (9th Cir. 1997). Furthermore, judicial bias is a structural defect, therefore, prejudice need not be proven. *Coley v. Bagley*, 706 F.3d 741,750 (6th Cir. 2013).

Trial judge Douglas Smith demonstrated bias against Durr and the defense team throughout Durr's proceedings beginning with jury selection and continuing through the trial and sentencing.

### Voir Dire

Judge Douglas Smith was hostile and rude throughout jury selection. In a bench conference about a juror that did not speak fluent English, the judge told

counsel that this was the worst jury panel he ever had in 32 years.[199] He did not keep his dissatisfaction between himself and counsel.  When Judge Smith dismissed the juror in question, he made a comment in front of the rest of the jury about the juror's lack of English fluency: "How could you be here 30 years and not speak English, brother, I don't understand."[200] Later that same day, Claus moved to strike for-cause another juror who admitted to not being fluent in English and seemed to have some difficulty understanding English, but the judge refused to do so.[201]

> MR. CLAUS: Do you believe that your English – that your grasp of English is sufficient to understand everything that is said here in the courtroom?
>
> PROSPECTIVE JUROR NO. 153: Not everything.
>
> MR. CLAUS: Do you believe that your English is sufficient to understand all the evidence that will be offered here?
>
> PROSPECTIVE JUROR NO. 153: Not everything.
>
> MR. CLAUS: Okay. Based upon that, do you believe that you should serve as a juror here?
>
> PROSPECTIVE JUROR NO. 153: As I say, yes, the judge decide.
>
> MR. CLAUS: Okay.
>
> THE COURT: I'm leaving him on.[202]

Despite the prospective juror admitting that he would not entirely understand the courtroom proceedings or evidence, the judge inexplicably refused to strike the juror for cause. But the issue did not end there. The following day, before voir dire

---

[199] Tr. 07/30/2018 at 223-224.

[200] Tr. 07/30/2018 at 225.

[201] Tr. 07/30/2018 at 246-247, 250.

[202] Tr. 07/30/2018 at 250-251.

continued, Claus renewed his request to strike Juror 153 due to his inability to sufficiently understand English. Claus brought up several incidents demonstrating Juror 153's difficulty with comprehension.[203] The judge responded by claiming that Claus was prejudiced against Hispanic people: "a lot of them have made—made that [mistake]. And you've not brought that objection up except for this Spanish speaker. The English ones, there was a couple of English ones that made that same mistake. And you've not bringing that up. It sounds to me like you're a little biased."[204] Claus responded by explaining why Juror 153's misunderstandings were different ("with the English speakers they clearly indicated that the reason why they miscommunicated is because they misunderstood my question").[205] Claus then shot back at the judge: "Your Honor, what we're talking about here is you've accused me of being biased against a Spanish speaker. I find that particularly hilarious when you're looking at sending Mr. Durr away for some amount of time if he's convicted of anything."[206] This exchange between the trial judge and defense counsel (started by the judge), where each said the other is biased, is completely inappropriate and demonstrated hostility by the judge towards the defense. Further, the resulting conflict further heightened the appearance of impermissible bias against the defense.

Later that day, during continued voir dire, the trial judge had more hostile interactions with the jury panel. Another juror, Prospective Juror 169, told the court he had not understood proceedings and was not fluent in English.[207] The subsequent

---

[203] Tr. 07/31/2018 at 5. Claus explained that Juror 153 initially answered no to the questions of whether he had ever served as a juror and whether he had been the victim of a crime. But later, during Claus's venire, he revealed he had been robbed by two people and had been a juror in a civil case.

[204] Tr. 07/31/2018 at 5.

[205] Tr. 07/31/2018 at 6.

[206] Tr. 07/31/2018 at 6.

[207] Tr. 07/31/2018 at 138.

conversation between the State and Juror 169 revealed confusion.[208] The judge let the juror go, saying "who the hell comes to the United States if they're not going to take care of business."[209] Following this exchange, the court clerk called Prospective Juror 176, Irene Winter, to fill the vacated seat.[210]

Ms. Winter informed the court that she has been extremely nervous all day sitting in the court "[m]y heart is – palpitation so hard. And it's like I cannot concentrate and my body is shaking."[211] The judge responded: "This is your opportunity as a citizen of the United States to sit and take part in this and you don't want to do that?... Because you're nervous. You think everybody else is not nervous?"[212] Ms. Winter informed the court that her nervousness was a result of having been the victim of a robbery the previous year, in Las Vegas.[213] She described feeling traumatized, a fear of walking alone, and hypervigilance.[214] As a result of the incident, Ms. Winter did not feel she could be fair and impartial.[215] The judge responded with incredible hostility to the situation:

> THE COURT: I don't think you're being fair to the others. So I've had it up to here with people trying to get off this jury. And you will do 300 hours of community service. You be back here every day at 9 o'clock and bring me – you'll be back tomorrow at 9 o'clock and you'll bring me proof of what your – where you're going to do your community service.

---

[208] Tr. 07/31/2018 at 139-144.

[209] Tr. 7/31/2018 at 144.

[210] Tr. 07/31/2018 at 144.

[211] Tr. 07/31/2018 at 145.

[212] Tr. 07/31/2018 at 145.

[213] Tr. 07/31/2018 at 146.

[214] Tr. 07/31/2018 at 147.

[215] Tr. 07/31/2018 at 147.

1
2

> Thank you. You're excused. Failure to do it, I'll issue
> a warrant for your arrest."[216]

3
4

After the incident with Ms. Winter, which took place in open court, the court continued with voir dire until a full jury was seated.

5
6
7
8
9
10
11
12
13
14
15
16
17

These additional interactions demonstrated a hostile attitude from the judge towards the jury, that was likely to bias proceedings against Durr. As a defendant, Durr had a constitutional right to an impartial jury, and voir dire is an essential step in composing such a jury. The judge's conduct was especially egregious because he reacted with hostility to a prospective juror admitting she could not be fair and impartial. It's likely that other prospective jurors would have kept similar feelings to themselves after witnessing the judge's interaction with Winter. Judge Smith's comments, criticizing and berating potential jurors, shows, at best, complete disregard for Durr's constitutional rights and at worst a predisposition against Durr. Either way, the judge's comments gave the appearance of bias against Durr, which was communicated to the jury. Judge Smith signaled to the jury through his behavior that Durr's right to have jurors that were fair and impartial, and that are able to fully participate in proceedings, did not matter.

18

**Trial**

19
20
21
22
23
24

The judge's bias against the defense continued to be on display during trial. For example, in a discussion between Claus, the prosecutor, and the court about limitations on Matthews's testimony, the judge told Claus, "I assume that you're going to ask questions that will try to confuse him and he'll make statements of why he's in custody."[217] This was after Claus told the court that he did not intend to open the door to that prohibited issue, and asked that the State admonish Matthews about

25
26
27

---

[216] Tr. 07/31/2018 at 147-148.

[217] Tr. 08/01/2018 at 32.

59

topics to avoid.[218] The judge's comment to Claus was not only rude, but unreasonably called into question Claus's integrity, and showed the judge's unfavorable predisposition towards the defense.

Just a few minutes later, the judge shifted his hostility to Durr's family. The judge told counsel, "A lot of the defendant's family is here. I want them watched." He continued, "I want him [the bailiff] to watch the family. And if there's any problem, if there's any signs, if there's any vale [veiled] threats to the witness—I'm going to put them in custody."[219]  The State interjected to renew the State's request from the previous day that the courtroom be closed during Matthew's testimony as a way to resolve the issue, which the judge agreed to.[220] The State's motion underscores the fact that if there was a real threat to Matthews, there was a less inflammatory way to resolve the potential problem than threatening to jail Durr's family members. However, there is nothing in the record indicating that Durr's family had ever made any threats against Matthews or had any intention of doing so. The judge's comments that they must be watched, and that he was already considering the possibility of putting them in custody, showed a bias against Durr that extended to his family.

Next, Judge Smith turned his hostility towards Durr himself. After the judge determined that the courtroom would be cleared for Matthews's testimony, the following exchange happened:

> THE COURT: And I don't know why you keep turning around and looking through the courtroom, Mr. Durr, you are to look forward and that's all. Do you understand me?
>
> THE DEFENDANT: [No audible response.]

---

[218] Tr. 08/01/2018 at 31.

[219] Tr. 08/01/2018 at 33.

[220] Tr. 08/01/2018 at 33.

1
2
3
4

> THE COURT: I can get Duct tape out and take care
> of it. But I don't want to have to do that. Is that
> understood?
>
> THE DEFENDANT: Yes.[221]

This comment was not only inappropriate and uncalled for, but also indicative of unwarranted hostility towards Durr. Even more concerningly, the judge knew that this type of comment was indicative of bias, or at least gave the appearance of bias, as he was reprimanded by the Nevada Supreme Court less than one week prior to this incident for threatening to duct tape a different defendant's mouth. *See In re the Honorable Douglas E. Smith*, Nevada Commission on Judicial Discipline, Case No. 2016-068, Stipulation and Order of Consent to Discipline at 2 (Jul. 26, 2018).[222] That reprimand resulted from another case in which the defendant was represented by Claus.[223]  As part of that reprimand, Judge Smith admitted that his conduct violated several rules of the Revised Nevada Code of Judicial Conduct including, but not limited to, Rule 1.2 (failing to act at all times in a matter that promotes public confidence in the independence, integrity, and impartiality of the judiciary and avoiding impropriety and the appearance of impropriety); Rule 2.2 (failing to perform all duties fairly and impartially ); and Rule 2.3(B) (failing to refrain from manifesting bias, prejudice, and harassment).[224]

The judge's bias and hostility to the defense continued the following day, during the testimony of Charlene Hanks, Matthews's girlfriend at the time of the incident. Claus attempted to engage in a line of questioning with Hanks with the goal

---

[221] Tr. 08/01/2018 at 34.

[222] Ex. 2: 07/26/2018 Stipulation and Order of Consent to Discipline.

[223] Ex. 2: 07/26/2018 Stipulation and Order of Consent to Discipline at 2.

[224] Ex. 2: 07/26/2018 Stipulation and Order of Consent to Discipline at 1.

of showing that the meet up between Matthews and Durr was a drug sale, and that Matthews sold marijuana.[225] The State objected to the line of questioning and asked to approach for a bench conference, which the judge granted.[226] The court determined that whether Matthews worked or was selling drugs was not relevant.[227]

Shortly thereafter, Claus was cross-examining Hanks about deleting text messages from her phone related to Matthews's scheme to catfish the robber with provocative photos of Hanks to trick him into showing up for Matthews to confront (which ultimately resulted in a shootout).[228] Hanks admitted that both she and Matthews had deleted those messages. Claus clarified that he wanted to be very specific, that he was asking Hanks about the text messages leading up to the shooting.[229] The judge interjected: "I let this go a little bit. But what you're saying is just like the question of, when you're drunk, did you hit your wife? And you don't know how to answer it. You just said, when the messages were destroyed, you destroyed them."[230] Claus responded that Hanks had already testified to the destruction of the messages. The judge responded "no, no. You used the word destroyed. She said I erased them but I do it all the time."[231]  The judge then acknowledged that there was not a difference between erase and destroy, but said that Claus "can't use the word destroyed."[232] The judge accused Claus of editorializing

---

[225] Tr. 08/02/2018 at 29.

[226] Tr. 08/02/2018 at 30-32.

[227] Tr. 08/02/2018 at 32.

[228] Tr. 08/02/2018 at 35.

[229] Tr. 08/02/2018 at 36.

[230] Tr. 08/02/2018 at 36.

[231] Tr. 08/02/2018 at 36.

[232] Tr. 08/02/2018 at 36.

by saying destroyed, when Ms. Hanks said delete.[233] This whole exchange occurred in the presence of the jury. At that point, Claus asked to approach for a bench conference, as counsel for the State had done shortly before, but Claus's request was denied.[234] After the bench conference was denied, Claus moved for a mistrial, simply saying "the editorialization that's going on here is not coming from me."[235] The judge did not rule on the motion for mistrial, and Claus returned to questioning Ms. Hanks.[236]

The judge continued his inappropriate editorialization throughout the cross-examination of Detective Nicholas Brigandi. Claus asked Brigandi a yes or no question related to Matthews trying to avoid the police, and Brigandi was resistant to answering with yes or no. When Brigandi failed to answer the question, instead starting a narrative answer, Claus sought help from the court, but the court refused to order Brigandi to answer yes or no.[237] Brigandi continued to resist answering yes or no to Claus's questions. The court responded by admonishing Claus, in front of the jury: "you're not—stop. You're not going to talk to people that way. Now you can be polite and ask the question and expect the answer, but you don't have to editorialize yourself. I've told you that throughout."[238] Claus responded that he was trying to ask a question, to which the court responded, "well, then ask the question. You don't have to be that way about it."[239] At that point, Claus gave up and passed the witness.[240]

---

[233] Tr. 08/02/2018 at 36.

[234] Tr. 08/02/2018 at 36-37.

[235] Tr. 08/02/2018 at 37.

[236] Tr. 08/02/2018 at 37.

[237] Tr. 08/03/2018 at 57.

[238] Tr. 08/03/2018 at 57-58.

[239] Tr. 08/03/2018 at 58.

[240] Tr. 08/03/2018 at 58.

On recross, Brigandi continued to be difficult in response to Claus. Claus again sought help from the court, to order Brigandi to answer questions as posed, saying that the witness was becoming unmanageable.[241] In response, the judge offered his own testimony:

> THE COURT: Okay. Here's the problem, and I will get to that and he will answer your question. The problem is there's a lead detective that is in charge of certain things and then there's other detectives to do a lot of other things. A lot of people are involved in it. He may not have been that one that was—and I know you think the police agents are responsible for everything and they're not. They have specific duties and responsibilities. But go ahead and ask the question again and I'll tell him to answer it.[242]

Rather than simply order the witness to answer the question, the judge inappropriately offered his own testimony about the functioning of police teams, Claus's opinion of police, and the detective's testimony. Such commentary is not the purview of a neutral arbiter, and again showed the judge's bias against the defense. Brigandi continued to fail to directly answer questions.[243] Rather than order Brigandi to answer appropriately, the judge commented on his testimony, saying "he's trying to help you" to Claus on two occasions.[244] The judge's behavior throughout Brigandi's testimony showed his bias. Rather than help the defense manage a difficult witness, the judge editorialized about Brigandi's helpfulness, offered his own views about police, and criticized Claus in front of the jury, again exhibiting hostility towards Durr and the defense.

---

[241] Tr. 08/03/2018 at 63.

[242] Tr. 08/03/2018 at 63.

[243] Tr. 08/03/2018 at 64. Claus asked Brigandi if he conveyed to another detective that Matthews fired 15 shots. Rather than answering "yes" or "no", Brigandi again began a narrative answer.

[244] Tr. 08/03/2018 at 64, 66.

64

The judge's bias against Durr, and its impact on the case, was apparent at sentencing. The judge sentenced Durr to life without the possibility of parole despite the fact that the State only sought a sentence of 10 to life as a large habitual.[245] Parole and Probation did not even recommend sentencing Durr as a habitual.[246]

Despite a plethora of inappropriate, hostile behavior by the judge towards Durr himself and his counsel, Claus never directly raised the issue of judicial bias during trial. Although Claus failed to take appropriate action to protect Durr during trial, he could have still protected Durr by raising the issue on appeal. If he had, it's likely the conviction would have been reversed even on plain error review due to the extent of the judicial bias. In fact, Judge Smith was well known to the Nevada Supreme Court for repeated misconduct and was ultimately barred from being a member of the Nevada judiciary.[247] Any reasonable attorney would have raised the issue due to the obvious bias in the record, and the impact it had on Durr. If Durr had performed effectively as appellate counsel, there was a reasonable probability that the outcome of Durr's proceedings would have been different.

## B. Appellate counsel was ineffective for failing to raise the issue of the violation of Durr's right to an impartial jury on appeal.

Durr's jury was tainted by Judge Douglas Smith's hostile and inappropriate behavior. The Sixth Amendment of the United States Constitution guarantees criminal defendants the right to be tried by an impartial jury. The Supreme Court has held that "part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719,

---

[245] Tr. 10/01/2018 at 3.

[246] Tr. 10/01/2018 at 2.

[247] *See* Ex. 2: 07/27/2018 Stipulation and Order of Consent to Discipline; Ex. 3: 11/15/2022 Stipulation and Order of Consent to Bar From Serving in a Judicial Office in the Future.

729 (1992). "Without an adequate voir dire[,] the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Id.* at 729-30, quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion). Even in the absence of a showing of actual bias, "circumstances that create the likelihood or appearance of bias" during voir dire deprive the defendant the right to an impartial jury. *Peters v. Kiff*, 407 U.S. 493, 502 (1972). Claus was ineffective for failing to raise the issue of Durr's tainted jury, which violated his constitutional right to an impartial jury, on appeal.

Durr was denied his right to an impartial jury when the trial judge conducted a voir dire that fell below adequate judicial standard.[248] During voir dire, prospective juror Irene Winter expressed feeling "nervous all day long" and reported that her body was shaking.[249] When the State asked Winter to clarify why she felt nervous, she explained that she had been the victim of a robbery, the underlying charge of the Durr case, the prior year in Las Vegas.[250] Describing how she felt traumatized still by the experience, Winter said she did not believe that she could be fair and impartial.[251]

In response to her confirmation that she did not feel that she could be impartial, the trial judge berated her in front of the venire.[252] Trial judge Doug Smith accused her of not "being fair" to the other jurors and proclaimed that he "had it up

---

[248] *See* NCJC Canon 2, Rule 2.8(B) (stating that "a judge shall be patient, dignified, and courteous…to jurors").

[249] Tr. 07/31/2018 at 145.

[250] Tr. 07/31/2018 at 146.

[251] Tr. 07/31/2018 at 147.

[252] Tr. 07/31/2018 at 147.

66

to here with people trying to get off [the] jury."[253] To reinforce his sentiment, the trial judge ordered Winter to complete "300 hours of community service…[and to come] back [to court] every day at 9 o'clock."[254] As he excused Winter, trial judge Smith stated that he would issue a warrant for her arrest if she failed to follow his orders.[255] Winter recalls that even now, five years later, it causes her anxiety to think about this interaction with Judge Smith.[256]

Trial judge Smith's conduct was beyond the pale. When an impartial jury is not produced through a proper voir dire, the court has committed a structural error. *Barral v. State*, 131 Nev. 520, 523 (2015). Since a structural error affects at least one of the defendant's substantial rights, the Court must analyze the error on the basis that it is "intrinsically harmful." *Id.* (quoting *Cortinas v. State*, 124 Nev. 1013, 1024 (2008)). As an intrinsically harmful error, a criminal trial conducted without an impartial jury "require[s] automatic reversal…without regard to the effect on the outcome." *Id.*

The trial judge has a responsibility to impanel an impartial jury through an evaluation of the prospective jurors' responses to questions and demeanor. *Rosales-Lopez v. United States*, 451 U.S. 182, 188-89 (1981). Throughout this evaluation, the trial judge is required to "be patient, dignified, and courteous to…jurors." *Azucena v. State*, 135 Nev. 269, 272 (2019) (quoting NCJC Canon 2, Rule 2.8(B)). This requirement stems from the likelihood that the "judge's words and conduct…'mold[s] the opinion of the members of the jury to the extent that one or the other side of the controversy may be prejudiced.'" *Id.* (quoting *Parodi v. Washoe Med. Ctr., Inc.*, 111

---

[253] Tr. 07/31/2018 at 147.

[254] Tr. 07/31/2018 at 147-48.

[255] Tr. 07/31/2018 at 148.

[256] Ex. 4: Declaration of Irene Winter.

Nev. 365, 367-68 (1995)). When a judge creates an "atmosphere of intimidation" and does nothing to reduce the impact of this environment during voir dire, the impartiality of the jury is unassured. *Id.* at 274. In *Azucena*, the trial judge accused a prospective juror of "try[ing] to make shit up" to get out of jury service when she expressed uncertainty about being unbiased toward the defendant because of her own exposure to the type of alleged crimes working as a nurse with children. *Id.* at 269 & 272-73. During this accusation, the judge yelled at the prospective juror and threw a book against the wall before excusing her from the jury. *Id.* at 270. The trial judge then promptly continued voir dire, producing uncertainty about the impartiality of the jury selected. *Id.* at 271.

The same was true here. After the confrontation with Ms. Winter, Judge Smith continued voir dire without explaining his conduct to the jury.[257] By failing to mitigate the atmosphere of intimidation that he had created, trial judge Smith tainted the prospective juror pool by producing a chilling effect: the remaining prospective jurors feared reprisal for being forthcoming and honest, having just witnessed one such prospective juror be punished with community service and potential arrest for such candor. When prospective jurors are given cause to fear reprisals for truthful answers, their respective answers to questions of voir dire cannot be presumed to be truthful. *United States v. Rowe*, 106 F.3d 1226, 1229 (5th Cir. 1997). In *Rowe*, the trial judge punished one prospective juror with an order to "com[e] back [to court] again, and again, and again…" when she expressed concern about being impartial given the nature of the charge and her relationship to a narcotics officer. *Id.* at 1228. Having berated and punished both this prospective juror and another who also expressed uncertainty about being impartial in the matter of the case such that the remainder of the venire could hear it, the trial judge produced

---

[257] Tr. 07/31/2018 at 148.

an atmosphere in which the venire's members did not feel that they could be candidly honest in response to questions for fear of similar punishment. *Id.* at 1229-30. When a trial judge fails to reduce the impact of the atmosphere of intimidation he has produced during voir dire, the entire venire has been tainted. *Id.* at 274. Despite the judge's intention to merely reprimand the sole respective prospective juror being berated, his words and demeanor have a "chilling effect" on the entire venire. *Id.* at 271.

The trial judge's substandard conduct with the venire produced, at a minimum, a trial jury that had the appearance of bias. Furthermore, the likelihood of bias was also apparent since the remaining prospective jurors probably reacted accordingly to the trial judge's visible and vocal condemnation of another prospective juror's candid expression of uncertainty about being impartial. To rectify the likelihood that the remaining prospective jurors were less forthcoming in their responses to voir dire questioning, defense counsel should have moved to strike the venire and replace it with a pool of prospective jurors who had not been tainted by the trial judge's hostile conduct.

Claus failed to take any action at trial to protect Durr from the tainted jury. Despite this failure, Claus still could have taken action to protect Durr's rights on appeal. Claus should have raised the violation of Durr's right to an impartial jury on appeal because it was likely to be successful and achieve reversal even on plain error review. In fact, Judge Smith was well known to the Nevada Supreme Court for repeated misconduct and was ultimately barred from being a member of the Nevada judiciary.[258] Because a violation of the right to an impartial jury is a structural error, Durr would not have needed to prove prejudice on appeal, only that the jury was

---

[258] *See* Ex. 2: 07/27/2018 Stipulation and Order of Consent to Discipline; Ex. 3: 11/15/2022 Stipulation and Order of Consent to Bar From Serving in a Judicial Office in the Future.

tainted. The record makes it manifestly clear in this case that Durr's jury was tainted by the judge's inappropriate behavior, so this claim is plainly meritorious.

There is a reasonable probability that Durr would have obtained a reversal of his conviction had Claus performed effectively and raised this claim on appeal. His performance violated Durr's constitutional right to counsel.

### C. Appellate counsel was ineffective for failing to request reconsideration of Durr's sentence under the Nevada Habitual Offender law when the law changed in Durr's favor while his appeal was pending.

At the time that Durr was prosecuted the Nevada habitual offender law required only four convictions for a person to qualify for punishment as a large habitual offender. The present case was Durr's fourth conviction, making him at the threshold for large habitual offender punishment. Despite having the lowest possible number of convictions to qualify for the enhanced punishment, Durr received the most severe possible sentence of life in prison without the possibility of parole.

While Durr's case was pending on direct appeal, Nevada changed the habitual offender law. *Compare* Nev. Rev. Stat § 207.010 (2017) to Nev. Rev. Stat § 207.010 (2020). Under the new (and current) version, seven convictions were required for punishment as a large habitual offender. Nev. Rev. Stat § 207.010(b) (2020). Given that Durr's case on appeal was pending when the new law came out, he still had a chance for remand and reconsideration of his conviction because it was not yet final. Despite this, his appellate attorney Augustus Claus failed to request reconsideration of Durr's sentence in light of the new law. This is especially egregious in this case, given the many instances of judicial bias, and arbitrary nature of Durr's lifetime punishment. Durr incorporates the facts in Ground Nine here. If Claus had sought reconsideration, there's a reasonable probability that Durr's sentence would have been vacated, and he would not be looking at spending the rest of his life in prison. Any contrary decision by a state court would be contrary to, or an unreasonable

70

application of, clearly established federal law, and/or would involve an unreasonable determination of the facts.  See 28 U.S.C. 2254(d)(1) and (2).  The writ should be granted, and the conviction and sentence should be vacated.

**Ground Nine: Durr's sentence of life imprisonment without the possibility of parole for his unarmed robbery conviction constitutes cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments.**

**Statement of Exhaustion:** This claim was exhausted on direct appeal to the Nevada Supreme Court.

The United States Constitution protects defendants from cruel and unusual punishment. U.S. Const. amend. VIII. The Eighth Amendment "prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed." *Solem v. Helm*, 463 U.S. 277, 284 (1983). Durr's sentence of life imprisonment without the possibility of parole is grossly disproportionate to his conviction of robbery, especially considering Durr's conviction was almost certainly under an aiding and abetting theory, and that no injuries resulted from the robbery. This sentence is even more disproportionate considering Durr had the minimum number of convictions required to be sentenced as a large habitual at the time, and under the present law, Durr would not even be eligible for a sentence of life in prison without the possibility of parole. *Compare* NV Rev. Stat §207.010 (2017) to NV Rev. Stat §207.010 (2020).

Durr was charged conspiracy to commit robbery; robbery with use of a deadly weapon; three counts of assault with a deadly weapon; three counts of discharging firearm at or into occupied structure, vehicle, aircraft or watercraft; and ownership or possession of firearm by prohibited person.[259] The charge of prohibited person in

---

[259] 11/15/2017 Indictment.

71

possession of a firearm was later dropped.[260] Ultimately, Durr was acquitted of all charges but the robbery.[261] The jury even acquitted Durr of using a deadly during the robbery.[262] The State pleaded the robbery charge with three possible scenarios of guilt: conspiracy to commit robbery, committing the robbery himself, or aiding and abetting in the commission of the robbery.[263] The evidence, including a videotape of the incident, as well as the victim's testimony, established that Durr was not the one that directly robbed Matthews.[264] It was the allegedly unknown co-conspirator D.[265] Further, the jury acquitted Durr of the conspiracy to commit robbery charge, leading to an inference that the conviction was based on the aiding and abetting theory.[266]

Robbery normally carries a penalty in Nevada of 2 to 15 years. NRS 200.380. The State sought to sentence Durr under Nevada's habitual offender law. The present conviction was Durr's fourth—the minimum number of convictions required at the time to qualify for sentencing under the large habitual statute. (Shortly after Durr's conviction, the law was changed to require seven convictions to qualify for punishment as a large habitual offender.) *Compare* Nev. Rev. Stat § 207.010 (2017) to Nev. Rev. Stat § 207.010 (2020). At sentencing, the State asked that Durr be sentenced to the lowest of the options under the large habitual statute: 10 years to life.[267] In their sentencing presentation, the State referenced Durr's prior convictions

---

[260] 07/31/2018 Amended Indictment.

[261] 08/06/2018 Verdict.

[262] 08/06/2018 Verdict.

[263] 07/31/2018 Amended Indictment at 2.

[264] Tr. 08/01/2018 at 46; Tr. 08/03/2018 at 185-193.

[265] Tr. 08/01/2018 at 46; Tr. 08/03/2018 at 185-193.

[266] 08/06/2018 Verdict.

[267] Tr. 10/01/2018 at 3-6.

as justification for their request for 10 to life.[268] Parole and Probation did not recommend sentencing as a habitual offender.[269] Contrary to the recommendations of the State and Parole and Probation, Judge Douglas Smith sentenced Durr to life in prison without the possibility of parole. The judge vaguely cited Durr's criminal history and the court's belief that Durr was a "danger to society" in issuing his sentence.[270] He did not explain why Durr's criminal history compelled him to choose the harshest possible sentence, as opposed to the lesser options for habitual offenders, as argued for by the State. As such, in addition to cruel and unusual, Durr's sentence appears to be arbitrary and not clearly linked to the facts of the case. Furthermore, Durr's sentence is likely a result of the judicial bias that was apparent throughout the trial. Durr incorporates the facts in Ground Six here.

While Durr qualified for sentencing as a large habitual at the time, the facts in this case do not support sentencing Durr to the most severe penalty. The State, in asking for 10 to life, took into account their perception of Durr's dangerousness. In fact, the judge acknowledged in a subsequent hearing that the State's argument for 10 to life was spot on.[271] The judge only decided to impose the sentence of life imprisonment without the possibility of parole after hearing Durr speak at sentencing and maintain his innocence. Moreover, no one was injured during the robbery, the evidence was weak as to Durr's involvement, and, if Durr was involved in the robbery, the evidence showed that Durr was not the primary perpetrator of the crime. Underscoring the cruelty and arbitrariness of his sentence, is that the alleged unknown accomplice D, the actual perpetrator of the crime, who was known to police

---

[268] Tr. 10/01/2018 at 3-4.

[269] Tr. 10/01/2018 at 2.

[270] Tr. 10/01/2018 at 19.

[271] Tr. 10/17/2018 at 3.

as Devon Freeman, was not arrested for this crime, and his identity was never disclosed to Durr. *See* Ground Four. Durr's sentence of life without the possibility of parole is so wildly disproportionate to the crime as to constitute cruel and unusual punishment. Any contrary decision by a state court would be contrary to, or an unreasonable application of, clearly established federal law, and/or would involve an unreasonable determination of the facts. See 28 U.S.C. 2254(d)(1) and (2). The writ should be granted, and the conviction and sentence should be vacated.

**Ground Ten: Durr is entitled to relief because of the cumulative effect of the errors raised on direct appeal and in this petition.**

**Statement of Exhaustion:** This is a new claim.

The errors set forth in Grounds One through Nine above implicate important federal constitutional rights. The cumulative effect of the errors severely prejudiced Durr, deprived him of a fair trial on the issue of his guilt or innocence of the charges, and also rendered his conviction unreliable. Therefore, the writ should be granted and Durr's conviction and sentence should be vacated.

## PRAYER FOR RELIEF

Accordingly, Terrel Durr respectfully requests that this Court:

1.    Issue a writ of habeas corpus to have Terrel Durr brought before the Court so that he may be discharged from his unconstitutional confinement;

2.    Conduct an evidentiary hearing at which proof may be offered concerning the allegations in this amended petition and any defenses that may be raised by respondents; and

3.    Grant such other and further relief as, in the interests of justice, may be appropriate.

74

Dated June 27, 2023.

Respectfully submitted,

Rene L. Valladares
Federal Public Defender

*/s/ Laura Barrera*

Laura Barrera
Assistant Federal Public Defender

## DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury under the laws of the United States of America and the State of Nevada that the facts alleged in this petition are true and correct to the best of counsel's knowledge, information, and belief.

Dated June 27, 2023.

Respectfully submitted,

Rene L. Valladares
Federal Public Defender

*/s/ Laura Barrera*

Laura Barrera
Assistant Federal Public Defender